## 15636

### JESTER v. SOUTHERN RAILWAY COMPANY

(29 S. E. (2d), 768)

October, 1943.

·Mr. *Frank G. Tompkins,* of Columbia, S. C., and *Mr. Proctor A. Bonham,* of Greenville, S. C., Counsel for Appellant,

*Messrs. Price & Poag,* of Greenville, S. C., Counsel for Respondent,

Counsel for Appellant, in Reply,

April 7, 1944.

Mr. Chief Justice Baker delivered the unanimous Opinion of the Court:

This action was brought under the Federal Employers' Liability Act, as amended, 45 U. S. C. A., § 51 *et seq.,* for the benefit of the widow and two minor children of the de-

ceased. The cause of action was based upon the alleged negligence of the appellant, its officers, agents or employees.

Respondent's intestate was employed by the appellant as a fireman, and on July 28, 1942, was engaged in that capacity on a freight train of the appellant, with one, C. H. Black, as engineer in charge of the engine. While on this trip, an argument arose between the fireman and engineer, resulting in the death of C. V. Jester, the fireman, caused by pistol shots fired into his body by C. H. Black, the engineer.

The particulars in which it was charged that the appellant and its employee, Engineer Black, were negligent were that said Black was a turbulent and violent person in his conduct towards other employees and that he habitually carried a pistol about his person in the performance of his duties, of which facts the appellant's superior officers had knowledge and notice and it was alleged that the appellant was negligent in retaining Black in its employment. As to C. H. Black it was alleged that he threatened and abused the deceased in giving orders about the use by the deceased of the water injector of said engine; and, in attempting to enforce his orders as to the injector, negligently shot the deceased twice, while both the engineer and fireman were engaged in the work assigned to them and while Black was in the actual scope of his agency as engineer; and it was further alleged that Black, while acting within the scope of his agency and employment, shot the deceased in enforcing his orders and instructions as engineer, while the fireman was using the coal scoop in the performance of his duties.

While, as appears from the above specifications of negligence, the cause of action was based upon two grounds of negligence, no proof was offered to sustain the allegation that the appellant retained the engineer in its employment with notice and knowledge by its superior officers that the engineer was a turbulent and violent person, in his conduct toward other employees and that he habitually carried a pistol about his person in the performance of his duties; and

the respondent abandoned this allegation of negligence and relied entirely upon the allegation that the engineer negligently shot the fireman, while both were acting within the scope of and in performance of their duties.

The answer of the appellant set up a general denial and pleaded contributory negligence and assumption of risk. However, it is conceded that the Federal Employers' Liability Act is applicable.

At the close of the testimony for respondent, the appellant announced that it had no testimony to offer and moved the Court for a directed verdict upon several grounds, the substance of which was that the testimony failed to show that in shooting the fireman, the engineer was acting within the scope of his agency and in furtherance of the appellant's business, but on the contrary the testimony did show that the act of the engineer was done for purely personal reasons; and that a verdict for the respondent could be predicated only upon conjecture.

This motion was overruled, and a jury returned a verdict in favor of respondent. The appellant then moved for a new trial, which motion was likewise refused, and this appeal followed.

The sole issue in this appeal is whether or not the testimony adduced upon the trial of the case was sufficient to require the submission to the jury of the question if the engineer, C. H. Black, in the shooting of C. V. Jester, the fireman, was acting within the scope of his agency and in furtherance of the appellant's business. In undertaking to decide this issue, it is necessary that we briefly set forth the testimony, and apply the law as established by the Federal decisions which is binding upon this Court in a case brought under the Federal Employers' Liability Act.

Charles W. Ambrose, an employee of the appellant, testified that he was supply man at the roundhouse of appellant at Greenville, S. C., and in preparing the engine on which

Black and Jester were the engineer and fireman, respectively, to go on the run, he placed a machinist hammer on the right-hand side of the watertank, the engineer's side, and that this hammer was there when the engine left the roundhouse; that it was customary to place such a hammer on the watertank or engine when it was going out on a trip, but it could be put on either side of the watertank. G. H. Short, the conductor on the train, testified that between Greenville, the starting point of the train, and the place of the shooting, about halfway between Wellford, S. C., and Lyman, S. C., it was necessary for the engine to do considerable shifting of cars in the placing of empty cars and the picking up of loaded cars at various points; that he rode in the engine out of Greer, S. C., to a siding near there, and noticed the hammer on the corner of the tank on the engineer's side; that at Wellford, while the train was stopped and he was in the telegraph office, he heard the engineer and fireman "fussing with each other, at which time they were on the engine, but both got off the engine on to the ground on the opposite or farther side of the engine from the telegraph office (the record does not disclose if this was the engineer's or fireman's side of the engine); that he went out where they were and inquired as to the trouble between them, and the engineer said he had told the fireman to keep his hands off the water injector, and he wouldn't do it; that the injector puts cold water in the boiler, which is necessary to the operation of the engine, and there is one both on the engineer's and fireman's side, so that either may conveniently operate it; that the injector is operated by the pulling down of a lever; that it is usually a matter of mutual understanding as to which would operate the injector, but that the engineer being in charge of the engine, had the authority to elect if it should be used solely by himself; that it was necessary that this injector be operated every fifteen or thirty minutes; that he told them to get back on the engine and get their work done, and after arguing again as to which would first get back on the engine,

the fireman finally preceded the engineer, and considerable shifting of cars was done in and around Wellford and the train proceeded to a pass track where the shooting took place; that this was about one and one-half hours after the trouble between the engineer and the fireman at Wellford; that the train was backed up the main line to said passing track, and upon reaching the switch to the pass track the train was stopped to open the said switch; that as the train was backing in on the pass track, the engine and cars came to a stop without any signal so to do, which attracted his attention to the engine; that he saw the engineer get off the seat box, and heard him and the fireman quarreling; that he was then about one hundred and sixty feet away; that he started walking back towards the engine and when he had walked the length of one car, forty feet, he heard a shot fired, and the fireman exclaimed "Oh, Lord, Dick," and then a second shot was fired; that "Dick" was the engineer; that following the second shot, "I saw the bulk of something come out of the engine to the ground; I don't know whether it fell out or jumped out; and I kept going up that way and when I got in a couple of car lengths of the engine the engineer got up off the ground and came back meeting me, or apparently from the ground; and I said 'You have played the devil now,' and he said, 'He was after me with a hammer' "; that the engineer said they came out of the engine together; that Jester was in a dying condition when he reached him, and there was no hammer on the ground where he was lying; that another train was coming, so he instructed the engineer to back the train and get in the clear; that upon getting on the engine he looked for the hammer and it was on the same corner of the tank where he had seen it earlier at Greer; that he called the engineer's attention to the hammer on the corner of the tank, and the engineer said: "How come that there, when he struck at me, I throwed my arm up and it fell over there"; that the fireman's cap and

glove, and the coal scoop were on the deck of the engine (the floor of the engine), about the center.

The widow of Jester .(also the respondent herein in her representative capacity.) testified as to her dependency and that of their children upon the earnings of the deceased, and the amount thereof, etc., and exhibited in Court .the overalls and overall jumper worn by Jester at the time he was shot and killed, which bore evidence of a bullet hole over the right hip, and one on the left just about the middle of the pocket of the overall jumper.

The testimony showed that the engineer, Black, weighed about 250 pounds and that the fireman, Jester, weighed between 135 and 140 pounds, and both appeared to have normal health, but we attach no particular importance to the difference in the weight of the two men.

It was on the foregoing testimony that appellant's motion for a directed verdict was overruled, and the case submitted to the jury.

The Federal Employers' Liability Act, as amended August 11, 1939, 45 U. .S. C. A., § 51, is in part as follows:

"Every common carrier by railroad while engaging in commerce between any of the several States or Territories, * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; * *· * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, * * *."

It would appear from the decisions of the United States Supreme Court in cases governed by this Act, that a willful act is included in the word "negligence" as used therein when the willful act is committed in furtherance of the master's business. *Jamison et al. v. Encarnacion,* .281 U. S., 635, 50 S. Ct., 440, 74 L. Ed., 1082; *Alpha Steamship Corporation*

*et al. v. Cain,* 281 U. S., 642, 50 S. Ct., 443, 74 L. Ed., 1086.

We do not regard the cases cited above as being in conflict with the case of *Davis, Director General v. Green, Adm'x,* 260 U. S., 349, 43 S. Ct., 123, 67 L. Ed., 299, a case involving the Federal Employers' Liability Act, 45 U. S. C. A., § 51 *et seq.* The facts of the *Green case* as disclosed by the report of the case in *Hines v. Green,* 125 Miss., 476, 87 So., 649, are furnished us by the brief of the respondent herein, from which we quote:

"The deceased, Jesse Green, was a conductor employed by Walker D. Hines, Director General of Railroads, on the railway yards at Hattiesburg, Mississippi. He was shot and killed by an engineer by the name of McLendon, also employed by the same defendant. The shooting occurred in said railway yards at Hattiesburg, Mississippi.

"The deceased was conductor of a switching crew operating in the railway yards. The engineer was in charge of the engine which was engaged in moving certain cars from one point to another. In addition to the engineer and several other crew members, there was a negro switchman, who incurred the anger of Engineer McLendon by repeating a certain signal several times, after the latter had told him not to give any signal but once. The switchman, after repeating the particular signal on this occasion, mounted the running board of the locomotive. Apparently infuriated at the switchman for failing to do as he said, the engineer, armed with a heavy hammer, came down from his cab and berated the negro for disobeying him. The switchman replied that he was doing the best he could to follow out the instructions of Green, the deceased conductor, *who was foreman of the crew and over all of them.* McLendon, the engineer, replied *that he would kill both the switchman and the conductor.* He thereupon knocked the negro off the running board with the hammer. The switchman was so badly injured that he had to be sent to a hospital, which necessitated some of the

train crew having to leave their jobs in order to carry him. McLendon, in a most coldblooded and indifferent manner, started up the engine and ran it on the switch, which was to have been thrown by the injured negro. He knew, of course, that the negro could not perform this task. McLendon stopped the engine and the deceased proceeded from one of the cars in the rear of the engine to throw the switch himself, which it was his duty to do in the event of an emergency such as then faced the crew. McLendon came down from his cab with a pistol and went to the front of his engine and when Green came up he exclamed, 'Why in the hell have you not thrown the switch?' Almost immediately he fired two or three shots at the conductor and killed him on the spot. There was evidence of the bad reputation of the engineer for violence and further evidence of previous differences and ill will between the two men. Several months before this instance the deceased had applied for and obtained a transfer which separated him from the engine man whose bad reputation was known to the deceased. Knowing that he might again be assigned to a crew with McLendon, the deceased, a short time before his death, applied for another transfer from night work to day work, which was granted, and he was in fact assigned to work with the man who later shot and killed him. It appeared that several times Green had reported McLendon for failure to perform his duties as required by the rules of the railway company."

In reversing the Supreme Court of Mississippi which had affirmed a verdict for the Administratrix of Green, the U. S. Supreme Court opinion reads in part is follows (260 U. S., 349, 43 S. Ct., 124, 67 L. Ed., 299) :

"The ground on which the Railroad Company was held was that it had negligently employed a dangerous man with notice of his characteristics, and that the killing occurred in the course of the engineer's employment. But neither allegations nor proof present the killing as done to further the master's business or as anything but a wanton and willful

act done to satisfy the tempor or spite of the engineer. Whatever may be the law of Mississippi a railroad company is not liable for such an act under the statutes of the United States. The only sense in which the engineer was acting in the course of his employment was that he had received an order from Green which it was his duty to obey—in other words that he did a willful act wholly outside the scope of his employment while his employment was going on. We see nothing in the evidence that would justify a verdict unless the doctrine of *respondeat superior* applies."

The case of *Simmons v. Okeetee Club*, 86 S. C., 73, 68 S. E., 131, is a sidelight on the issue involved here. In that case the plaintiff had been shot and wounded by one W. D. Thomas, the agent of Okeetee Club, for having cut a fence which said Club had built on land claimed by both Simmons and Thomas. In affirming an order of nonsuit, this Court said:

"The undisputed testimony showed that at the time of the shooting the fence had been cut by the plaintiff, who had resumed work on the railroad about 1,600 feet from the place where the fence [had] stood; and of course he was not then attempting to injure the fence. The act of destroying the fence was then completely executed. If the testimony had shown that the shooting took place while the work of destruction was in *fieri*, the nonsuit would have been improper. But we fail to see what relation the shooting had to the protection of the property, as it could not be successfully contended that it would prevent the plaintiff in future from cutting the fence. Under such circumstances the Court cannot hold that there was testimony tending to show that the shooting was within the implied authority of the agent."

In *Brady v. Southern Railway Co.*, reported in 320 U. S., 476, 64 S. Ct., 232, 234, 88 L. Ed., —, it is stated that: "The weight of the evidence under the (Federal) Employers' Act must be more than a scintilla before the case may be properly left to the discretion of the trier of facts—in this case, the

jury. (Citing authorities). When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by nonsuit, directed or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial the result is saved from the mischance of speculation over legally unfounded claims." (Citing authorities.)

The foregoing is in line with the rule of law prevailing in this State governing the granting of nonsuits and direction of verdicts, although theoretically this Court adheres to the scintilla rule.

In *Bushardt v. United Investment Co.*, 121 S. C., 324, 113 S. E., 637, 639, 35 A. L. R., 637, we find the rule stated as follows: "Under the well-settled rule, if only one reasonable or legitimate inference can be drawn from the evidence, the question is one of law for the court." In commenting upon this rule, that eminent and learned jurist, the late Chief Justice Bonham, in writing the opinion of the Court in *Turner v. American Motorists Ins. Co.*, 176 S. C., 260, 180 S. E., 55, 57, said: "This declaration is but to say that the scintilla of evidence upon which a case should be sent to the jury must be real, material and pertinent and relevant evidence, not speculative and theoretical deductions." In *National Bank v. Thomas J. Barrett, Jr., & Co.*, 173 S. C., 1, 174 S. E., 581, 582, which opinion was also written by Mr. Justice Bonham, it is stated: "If it be conceded that there may be deduced by a process of unusual finesse of reasoning that there is a scintilla of evidence * * *, nevertheless there is another rule, more founded upon common sense and reason, to the effect that when only one reasonable inference, not just one inference, but one reasonable inference, can be deduced from the evidence, it becomes a question of law for the court, and not a question of fact for the jury."

It is the established law of this State, and in Federal Courts, that verdicts cannot be allowed to rest upon mere surmise, conjecture and speculation, the citation of authority for which postulate is unnecessary.

However, the most recent pronouncement of the law governing the issue now before the Court is contained in *Tennant v. Peoria & P. U. R. Co.,* reported in 64 S. Ct., 409, 411, 88 L. Ed., —, and reads as follows:

"In order to recover under the Federal Employers' Liability Act it was incumbent upon petitioner to prove that respondent was negligent and that such negligences was the proximate cause in whole or in part of the fatal accident. *Tiller v. Atlantic Coast Line R. Co.* 318 U. S., 54. 67, 63 S. Ct., 444, 451, [87 L. Ed., 610, 617], 143 A. L. R., 967. Petitioner was required to present probative facts from which the negligence and the causal relation could reasonably be inferred. 'The essential requirement is that mere speculation be not allowed to do duty for probative facts after making due allowance for all reasonably possible inferences favoring the party whose case is attacked.' *Galloway v. United States,* 319 U. S. 372, 395, 63 S. Ct., 1077, 1089, 87 L. Ed., 1458 [1473]; *Atchison, T. & S. F. R. Co. v. Toops,* 281 U. S., 351, 50 S. Ct., 281, 74 L. Ed., 896. If that requirement is met * * *, the issues may properly be presented to the jury. No court is then justified in substituting its conclusions for those of the twelve jurors. * * *

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its func-

tion is to select from among conflicting inferences and conclusions that which it considers most reasonable. *Washington & G. R. Co. v. McDade,* 135 U. S., 554, 571, 572, 10 S. Ct., 1044, 1049, 34 L. Ed., 235, [241, 242]; *Tiller v. Atlantic Coast Line R. Co., supra,* 318 U. S., 68, 63 S. Ct. [87 L. Ed., 618], 143 A. L. R., 967; *Bailey v. Central Vermont R. Co.,* 319 U. S., 350, 353, 354, 63 S. Ct., 1062, 1064, 87 L. Ed., 1444 [1447, 1448]. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."

We can disregard the statement of the engineer, Black, made to the conductor, Short, immediately following the shooting of the fireman, Jester, that he had to do it, that he (Jester) was after him with a hammer, because the circumstantial evidence in the case as to the hammer being in the same place after the difficulty as before would have made an issue for the jury to decide whether Black, at the time of shooting Jester, was acting in self-defense.

This then leaves the issues whether a reasonable inference can be drawn from the testimony that at the time Black negligently (willfully) shot Jester, both were engaged in the discharge of their duties, and whether the engineer was attempting to enforce his orders as to the use of the water injector, and whether the shooting was done while the fireman was using the coal scoop in the performance of his duties.

We think that it is a reasonable inference from the testimony that the fireman was at least preparing to use the coal scoop in the discharge of his duties at the time he was shot, and this being an issue, it was properly submitted to the jury.

The remaining issue, that is, whether the engineer was attempting to enforce his orders as to the use of the water in-

jector by the fireman at the time he fired the shots, is not free from doubt. The water injectors on an engine are operated by a lever being pulled all the way down, which causes water to flow into the boiler, without the replenishment of which the boiler would explode.

One and one-half hours prior to the shooting, the engineer and fireman had been in a violent quarrel over the use of the water injector by the fireman on the fireman's side of the engine, and according to the statements made to the conductor, although the engineer had ordered the fireman to desist from the use of the injector, which he had the right to do, the fireman had repeatedly used the injector. The evidence further shows that when the fireman and engineer got back on the engine upon being ordered so to do by the conductor, both were angry, and there was no reason to believe that the fireman would thereafter strictly obey the order of the engineer about the non-use of the injector. We cannot say as a matter of law that it was not a reasonable inference, without entering upon the field of speculation, that immediately prior to getting off the fireman's seat to fire the engine, the fireman again pulled the lever of the water injector on his side of the engine, and that upon this coming to the attention of the engineer, he shot the fireman.

As stated in *Tennant v. Peoria & P. U. R. Co.*, *supra:* "The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. * * * The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable."

Judgment affirmed.

MESSRS. ASSOCIATE JUSTICES FISHBURNE, STUKES, and OXNER concur.

MR. ASSOCIATE JUSTICE TAYLOR did not participate.