311 Ga. 320
FINAL COPY

S21A0247.  ACOSTA v. THE STATE.

MCMILLIAN, Justice.

Eder Acosta appeals his convictions for malice murder and first-degree cruelty to children in connection with the death of Bryan Guzman.[1] Acosta asserts that the trial court erred in admitting the statements he made during his first interview with law enforcement investigators and denying his request to charge the jury on the lesser offense of misdemeanor involuntary manslaughter. Discerning no error, we affirm.

---

[1] Bryan died on July 16, 2009, and on March 15, 2011, a Forsyth County grand jury indicted Acosta, charging him with malice murder, felony murder, aggravated battery, and first degree cruelty to children. Acosta's trial took place from June 11 to June 20, 2012, and the jury found Acosta guilty on all counts. The trial court sentenced Acosta to serve life in prison for malice murder and 20 years concurrent for first-degree cruelty to children. The aggravated battery charge was merged into the murder conviction, and the felony murder count was vacated as a matter of law. Acosta filed a motion for new trial on July 24, 2012, and new counsel amended that motion on August 8, 2018. The trial court denied the motion, as amended, on October 25, 2018, entered an amended sentence on November 30, 2018, and Acosta filed a timely appeal, which was docketed to the term of this Court beginning December 2020 and submitted for a decision on the briefs.

The evidence presented at trial showed that on the morning of July 16, 2009, Acosta carried six-year-old Bryan Guzman into a Forsyth County hospital emergency room. The child was not breathing and had no pulse. Bryan was intubated, and after approximately 40 minutes, the emergency room medical staff was able to restart his heart. Bryan was then airlifted to a children's hospital in Atlanta, where he died. An autopsy revealed that Bryan had suffered significant injuries to his head, scrotum, and abdomen from blunt force trauma. According to the forensic pathologist who performed the autopsy, Bryan's injuries and the bruising on his body were consistent with multiple, repetitive blows to his abdomen, a blow or a kick to his scrotum, and impact wounds to his head. The pathologist also testified that the abdominal injuries resulted in lacerations to Bryan's liver and two other organs, causing internal bleeding, and that although the injuries to any one of these organs could have proved fatal, the lacerations to the liver would have led to Bryan's death within minutes to hours of the injury.

Subsequent investigation by the Forsyth County Sheriff's

Department revealed that after Acosta moved into the home where Bryan lived, Bryan exhibited a number of unexplained injuries, including bruises, lumps, and a petechial rash;[2] that witnesses had seen Acosta hit Bryan; and that Bryan, who was nonverbal and autistic, appeared to be afraid of Acosta. In his first interview with investigators, Acosta said that he had seen one of Bryan's uncles hit him, but in his second interview, Acosta said that on the morning of Bryan's death, he had used his hands and fists in an effort to revive the child after he found that Bryan was not breathing. However, the forensic pathologist testified that the bruising on Bryan's abdomen was not in a location where cardio-pulmonary resuscitation (CPR) is performed and that Bryan's injuries were not consistent with the performance of that procedure.[3]

1. Acosta asserts that the trial court erred in admitting

---

[2] One of Bryan's treating physicians described the "petechial rash" as "broken capillary blood vessels on the surface of the skin," which can result from a number of causes, including trauma.

[3] Acosta does not contest the sufficiency of the evidence to support his convictions, and this Court no longer routinely conducts a sua sponte sufficiency review in non-death penalty cases. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020).

statements he made in the first of two interviews with investigators because he was in custody and should have been informed of his rights under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966), and that his statements were not voluntary because they were improperly induced in violation of former OCGA § 24-3-50[4] by the hope that he would not be charged with driving without a license if he spoke with the investigators. We disagree.

In considering the admissibility of a defendant's statement to law enforcement officers, "the trial court must look to the totality of the circumstances to decide whether the statement was made freely and voluntarily." *Cain v. State*, 306 Ga. 434, 438 (2) (831 SE2d 788) (2019) (citation and punctuation omitted). On appeal, "[a]lthough we defer to the trial court's findings of disputed facts, we review de novo the trial court's application of the law to the facts. And following a *Jackson-Denno*[5] hearing, this Court will not disturb the trial court's factual and credibility determinations unless they are clearly

---

[4] Because Acosta was tried in 2012, former OCGA § 24-3-50 applies in this case. See Ga. L. 2011, pp. 99, 214, § 101.

[5] See *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

4

erroneous." *Griffin v. State*, 309 Ga. 860, 868 (4) (849 SE2d 191) (2020) (citations and punctuation omitted).

With regard to Acosta's first interview with investigators, the evidence presented at the pretrial *Jackson-Denno* hearing showed the following. On the morning after Bryan's death, three undercover officers were assigned to surveil the residence where Bryan had lived with his mother, Laura Moreno; two uncles; and Acosta.[6] That morning, the officers observed Acosta, Moreno, and Bryan's 12-year-old brother leaving the residence in a Dodge Durango, with Acosta driving. The officers followed Acosta's vehicle to the parking lot of a nearby grocery store, where the three occupants of the vehicle went inside the store.

When Acosta and the others returned to the vehicle, the undercover officers approached them to ask if they would mind waiting to speak with an investigator who was looking into Bryan's

---

[6] Acosta and Moreno were involved in a romantic relationship and together had a young child, who also lived in the home. Moreno's eldest child, Bryan's older brother, lived with his father but was visiting Moreno's home at the time of Bryan's death.

death. [7] Acosta and the others were told that they did not have to speak with the investigator, but they agreed to wait for him. A short time later, two investigators, Detective Joseph Whirlow and Sergeant Braulio Franco, arrived and asked whether Acosta and Moreno would mind going to the police station to talk. Acosta and Moreno agreed to this request, but when the officers suggested that the couple follow them to the station in their vehicle, Acosta said that he did not have a driver's license. [8] With Acosta's consent, one of the undercover officers drove Acosta and the others to the police station in the Dodge Durango. The officer did not ask Acosta any questions, nor did he discuss the case on the four- to five-mile ride to the station.

The law enforcement officers who were in the parking lot with Acosta testified that Acosta was not under arrest when he was asked to go to the station. Moreover, each officer said that if Acosta had

---

[7] There is no evidence in the record as to whether Acosta knew he had been followed by the officers, and thus no evidence as to whether Acosta was aware that the officers had previously seen him driving without a license.

[8] We could locate no evidence in the record as to whether Moreno had a driver's license.

chosen not to accompany the investigators to the station, he was free to leave, and they would not have stopped him. In addition, Detective Whirlow testified that the investigators were not concerned with Acosta's lack of a driver's license because they were investigating a murder and, as they arrived after Acosta, they had not seen him driving. Another officer testified that Acosta was told that it was "okay" that he did not have a driver's license. Nevertheless, once Acosta said he had no license, the officers could not allow him to break the law by driving to the station without one.

At the station, the investigators followed their standard procedure of separating witnesses for their interviews[9] by placing Acosta and Moreno in separate interview rooms.[10] Sergeant Franco, who was fluent in Spanish, interviewed Moreno because she did not speak much English. Both Detective Whirlow and Sergeant Franco

---

[9] Detective Whirlow and Sergeant Franco testified at trial that they prefer not to interview people together because the interviewees may repeat each other's information or convey facts based on a collective understanding, even if that understanding is not consistent with each individual's personal recollection. Additionally, the presence of other people may cause a witness to conceal information.

[10] Because of his age, Bryan's brother was interviewed separately by a forensic interviewer.

participated in the interviews of Acosta, and they stated that because Acosta was not a suspect and was not under arrest, they did not inform him of his rights under *Miranda* before the first interview.

The doors to the interview rooms did not have locks, and Acosta was free to, and did, leave the room during the first interview. Although Detective Whirlow accompanied Acosta from the interview room to the bathroom and waited outside until he finished, he did so because a key-coded door separated the interview area from the bathroom; therefore, any visitor using the bathroom required assistance to re-enter the interview area. There was no evidence that Acosta was ever threatened, handcuffed, or otherwise restrained before or during the first interview.

Although Acosta was not allowed to see Moreno while she was being interviewed, the investigators left Acosta alone in his interview room for a time while they were gathering paperwork and while Moreno was being interviewed. They also provided Acosta water and allowed him to keep his cell phone and answer calls

8

during his interview. Acosta's side of the telephone calls was recorded, and at the *Jackson-Denno* hearing, with defense counsel's consent, Detective Whirlow read from a translation of the recorded phone conversations, during which Acosta spoke Spanish. According to that translation, Acosta explained to one caller that he was not at the police station because of his lack of a driver's license but was there to answer "normal questions, supposedly about Bryan," and told another caller that he was there because the investigators wanted to ask Moreno and him questions about Bryan's death.

During the interview, Acosta told investigators that he had seen one of Bryan's uncles strike the child, and after Detective Whirlow and Sergeant Franco completed the interviews with Acosta and Moreno, the investigators left to interview Bryan's uncles at another location. Before the investigators left, they asked Acosta and Moreno if the couple would mind waiting until the investigators returned, and Acosta and Moreno agreed. The investigators testified that neither Acosta nor Moreno was under arrest, and both were free to leave the police station. The couple were provided lunch during

their wait and were allowed to be together and to keep their phones.

After the uncles provided alibis for each other and furnished information implicating Acosta in Bryan's death, the investigators returned to the police station. They then conducted a second interview with Acosta. Because Acosta was considered a suspect at that point, Sergeant Franco read Acosta his rights under *Miranda*, and, at Acosta's request, he read them in Spanish. Acosta signed a waiver-of-rights form, and both officers witnessed his signature. It was during the second interview that Acosta admitted using his hands and fists on Bryan, leaving bruises on the child's body.

The trial court concluded that under the totality of the circumstances, Acosta was not in custody at the time of the first interview and expressly found that the statements in that interview were not induced with the hope of benefit.[11] Therefore, the trial court

---

[11] The trial court announced its ruling and findings at the *Jackson-Denno* hearing, and the limited portions of the trial court record selected by Acosta for inclusion in the record on appeal do not contain a written order on this issue. Acosta's appellate counsel asserts that no written order was ever entered, but the State represents that the trial court entered a written order consistent with its oral findings at the hearing.

ruled that the statements from the first interview were admissible. In reaching this ruling, the trial court expressly credited the officers' testimony that they would not have detained Acosta in the parking lot because they had no probable cause to do so and implicitly found that Acosta agreed to go to the police station voluntarily to speak with the investigators. The trial court determined that even though law enforcement would not let Acosta drive his car, he had a cell phone to call for a ride or he could have walked away. The trial court further found that though investigators interviewed Acosta separately from Moreno in a closed interview room, escorted him to the bathroom, and did not allow him to see Moreno while she was being interviewed, Acosta was nonetheless free to leave the building at any time while Moreno was being questioned. After reviewing the record, we conclude that the trial court committed no clear error in making its factual findings, so we review de novo the application of the law to those facts. See *Griffin*, 309 Ga. at 868 (4).

(a) Acosta first asserts that his statements from his initial interview should have been excluded because he did not receive a

*Miranda* warning prior to that interview.

> A person is considered to be in custody and *Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary.

*Harper v. State*, 310 Ga. 679, 682 (2) (853 SE2d 645) (2021) (citation and punctuation omitted).

Here, Acosta was not under formal arrest, and, accepting the trial court's factual findings and credibility determinations, we conclude that a reasonable person in Acosta's position would not perceive that he was in custody at the time of the first interview. The investigators asked, and did not demand, that Acosta talk to them at the police station, and Acosta voluntarily agreed to do so. Acosta then allowed one of the officers to drive him to the station. Moreover, nothing in the circumstances surrounding the first interview shows that Acosta was being detained or otherwise restrained. To the contrary, he was allowed to leave the interview room when he chose and to keep and use his phone, and the trial

12

court found that he was free to leave at any time. Therefore, considering the totality of the circumstances, the investigators were not required to read Acosta his rights under *Miranda* before conducting the first interview. See *State v. Rumph*, 307 Ga. 477, 481-82 (837 SE2d 358) (2019) (defendant was not in custody for purposes of *Miranda* where he voluntarily agreed to go with investigators to sheriff's office to give a statement; he was left alone in an unlocked interview room; and he was allowed to retain his phone, take phone calls, and leave the interview room for breaks); *Drake v. State*, 296 Ga. 286, 289-90 (2) (766 SE2d 447) (2014) (*Miranda* warning not required because defendant was not in custody where investigators requested, rather than demanded, to speak with him; he voluntarily agreed to go to the police station; and he was never physically restrained or threatened).

(b) Acosta also asserts that his statements in the first interview were not voluntary because they were improperly obtained in violation of former OCGA § 24-3-50 under a hope of benefit that he would not be charged with driving without a license if he cooperated

with investigators. Under that former Code section, "[t]o make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."[12] And "this Court consistently . . . interpreted the phrase 'slightest hope of benefit' as used in OCGA § 24-3-50 . . . to focus on promises related to reduced criminal punishment—a shorter sentence, lesser charges, or no charges at all." *Brown v. State*, 290 Ga. 865, 868-69 (2) (b) (725 SE2d 320) (2012).

Here, although the undercover officers observed Acosta in the act of driving, they first approached him in the grocery store parking lot so there is no evidence that Acosta knew the officers had seen him driving. Also, when the officers later learned that Acosta had no driver's license, there is no evidence that any of the officers or the investigators made any promises to Acosta with regard to any prior traffic violation. To the contrary, the evidence at the hearing showed

---

[12] This language was carried forward almost verbatim in OCGA § 24-8-824 of the current Evidence Code, which provides, "To make a confession admissible, it *shall* have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." (Emphasis supplied.)

that Acosta agreed to talk to investigators and accompany them to the station before the issue of his license arose, and when Acosta said that he did not have a license, he was told that it was "okay" but they could not let him drive. Acosta then consented to having an officer drive him to the station. The trial court expressly credited the officers' testimony that they would not have detained Acosta if he declined to speak with the investigators and chose instead to leave the parking lot. Additionally, Acosta's statements in his two phone conversations during the first interview reflect that he understood that he was not in trouble based on the traffic violation, but rather was there to answer questions about Bryan's death.

Under these circumstances, we ascertain no violation of former OCGA § 24-3-50 and affirm the trial court's finding that Acosta's statements in the first interview were not induced by a hope of benefit. See *Wilson v. State*, 293 Ga. 508, 510 (2) (748 SE2d 385) (2013) (no hope of benefit inducing statement where record reflects no promises, explicit or implicit, related to leniency in charges or sentence). Compare *Foster v. State*, 283 Ga. 484, 487-88 (2) (660

SE2d 521) (2008) (defendant's statements connecting himself to the murder weapon were involuntary where they were induced by law enforcement officers' written promise not to charge defendant with additional crimes related to the weapon).

2. Acosta also argues that the trial court erred in refusing to give the following charge on the lesser offense of misdemeanor involuntary manslaughter:

> A person commits the offense of involuntary manslaughter in the commission of a lawful act in an unlawful manner when he causes the death of another human being without any intention to do so by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm.

See OCGA § 16-5-3 (b) (providing that "[a] person who commits the offense of involuntary manslaughter in the commission of a lawful act in an unlawful manner, upon conviction thereof, shall be punished as for a misdemeanor"). Acosta asserts that the evidence supported a finding that he caused Bryan's death without any intention to do so by performing the lawful act of attempting to revive the child in a manner that became unlawful when it rose to

16

the level of reckless conduct.

During the charge conference, the State opposed the involuntary manslaughter charge, asserting that even if someone were inept at CPR, his or her actions would not be unlawful. Acosta's counsel offered no counterargument,[13] and the trial court declined to give the charge. Acosta thereafter did not object to the trial court's charge as given based on the omission of the involuntary manslaughter charge.

Because Acosta did not object to the trial court's charge as given, he is only entitled to plain error review of the omission of the involuntary manslaughter charge. See *Merritt v. State*, 310 Ga. 433, 440 (4) (a) (851 SE2d 555) (2020). To show plain error, Acosta "must

---

[13] However, Acosta notes on appeal that he had previously requested a charge on reckless conduct, and with regard to that charge, his counsel argued that although their "number one defense" was that Bryan was killed by one of his uncles, they also planned to argue that performing CPR incorrectly is negligence, which would justify a reckless conduct charge. The prosecutor countered that the evidence showed that either Acosta beat the child to death or the uncle did and Acosta performed CPR, but there was no evidence that Acosta consciously disregarded a substantial and unjustifiable risk in performing CPR as required for reckless conduct. The trial court declined to give the reckless conduct charge, and Acosta neither objected to that omission nor asserts error on that ground on appeal.

demonstrate that the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Hill v. State*, 310 Ga. 180, 194 (11) (a) (850 SE2d 110) (2020) (citation and punctuation omitted).

We discern no error, much less plain error. Although "there need only be slight evidence supporting the theory of [a requested jury] charge" to authorize the giving of that charge, see *McClure v. State*, 306 Ga. 856, 863 (1) (834 SE2d 96) (2019), a jury instruction on misdemeanor involuntary manslaughter premised on a lawful act performed in an unlawful manner is not warranted in this case. In *Folson v. State*, 278 Ga. 690, 693 (4) (606 SE2d 262) (2004), the appellant also asserted that the trial court erred in failing to give his requested charge on misdemeanor involuntary manslaughter, based on "his own testimony that he struck [the child victim] on the back to clear his airway and pressed the child's abdomen in an effort to perform CPR." Id. This Court determined that if the jury believed

18

that testimony, "it could have found that the child's injuries were inflicted by accident." Id. However, the record was devoid of "any evidence of an unlawful manner in which his lawful act of attempting to resuscitate the child was performed," and if the defendant's

> alleged efforts to perform CPR [were] shown to have become so violent as to produce the injuries described by the medical examiner, his actions would have constituted the offense of reckless conduct and he would not have been entitled to a charge on lawful act-unlawful manner involuntary manslaughter.

Id. Therefore, we concluded that the evidence did not support a charge on misdemeanor involuntary manslaughter, and the trial court did not err in rejecting the defendant's requested charge. See id.

Likewise, the only evidence that Acosta attempted to revive Bryan came from Acosta's statements to investigators that he had used his hands and fists on the child's abdomen to try to do so. Acosta contends that the jury could have found that his lawful attempts to revive Bryan became reckless conduct, which he argues

19

equates with the performance of a lawful act in an unlawful manner. However, the evidence at trial showed that Bryan suffered severe blunt force trauma to his abdomen, resulting in lacerations to three separate organs, the injuries to any of one of which could have led to the child's death. As in *Folson*, if Acosta's actions rose to the level of causing Bryan's multiple, severe injuries, Acosta would not have been performing a lawful act. Instead, Acosta would have been performing an unlawful act, the crime of reckless conduct. Accordingly, Acosta was not entitled to his requested charge on misdemeanor involuntary manslaughter, and the trial court did not err in refusing to instruct the jury on that offense. See *Folson*, 278 Ga. at 693 (4); *Paul v. State*, 274 Ga. 601, 604-05 (3) (a) (555 SE2d 716) (2001) (where in claiming to be disciplining his girlfriend's 10-year-old son, appellant's act of repeatedly striking the child with a belt to the point of causing severe injuries "comes so plainly within the definitions of reckless conduct that it cannot qualify as a lawful act, the trial court did not err when it declined to instruct the jury on lawful act-unlawful manner involuntary manslaughter."

20

(footnote omitted)).

*Judgment affirmed. All the Justices concur.*

Decided April 19, 2021.

Murder. Forsyth Superior Court. Before Judge Bagley.

*Stephen M. Reba; Clark & Towne, Jessica R. Towne*, for appellant.

*Penny A. Penn, District Attorney, Sandra A. Partridge, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, William C. Enfinger, Assistant Attorney General*, for appellee.