NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 5, 2026

S25A1444.  SCOTT v. THE STATE.

MCMILLIAN, Justice.

Jikevious Scott appeals from his convictions for felony murder and cruelty to children in the first degree in connection with the death of his child, Jayce Bell.[1] On appeal, Scott argues that (1) the statements he made in an interview should have been suppressed because he was not advised about his rights under *Miranda v. Arizona*, 384 US 436 (1966), (2) the trial court erred in admitting

---

[1] The crimes were committed on or about January 10, 2020. In December 2022, a Muscogee County grand jury indicted Scott for felony murder (Count 1) and cruelty to children in the first degree (Count 2). At a jury trial in June 2024, Scott was found guilty of both counts. On June 26, 2024, the trial court sentenced Scott to serve life in prison without the possibility of parole for felony murder. The cruelty to children in the first degree conviction was merged for sentencing purposes. Scott timely filed a motion for new trial, which was amended through new counsel on January 20, 2025. Following a hearing, the trial court denied the motion for new trial, as amended, on April 3, 2025. Scott timely filed a notice of appeal to the Court of Appeals, which properly transferred the case to this Court on July 15, 2025. The appeal was docketed to this Court's August 2025 term and submitted for a decision on the briefs.

certain evidence of prior difficulties without a hearing or limiting instruction, and (3) the trial court abused its discretion in denying Scott's motion for new trial because the verdict is strongly against the weight of the evidence and contrary to the principles of justice and equity. We conclude that a reasonable person in Scott's position would not believe that he was in custody during the interview such that no warnings under *Miranda* were required, any admission of the character evidence that Scott challenges was harmless, and the trial court properly exercised its discretion as the "thirteenth juror." We therefore affirm.

The evidence at trial showed that seven-month-old Jayce primarily lived with his mother, but on January 9, 2020, his mother dropped him off to be cared for by his father, Scott. On the evening of January 10, Jayce's mother was notified by Scott and his sister that Jayce was choking and being taken to the Piedmont Medical Center. The mother immediately left for the hospital.

In the early morning hours of January 11, an officer with the Columbus Police Department was called to the hospital to

investigate a report of an injured baby and spoke with Scott.[2] Scott told the officer that after giving Jayce a bath, Scott fed Jayce and then laid him down on a baby pillow. After finishing feeding him and laying him down, Scott left the room to smoke. A few minutes later, he went back to the bedroom to check on Jayce, where he found him choking on the milk. Scott said that he could hear Jayce gasping for air and noticed that Jayce's eyes were starting to roll in the back of his head. Scott stated that because of this, he lifted Jayce and began shaking him to get a response. Scott claimed that he did not drop Jayce and that Jayce did not strike his head or body on anything.

Scott subsequently agreed to be interviewed further, so the officer drove Scott to the police department where he was interviewed by Detective David Marrero. During the interview, Scott again stated that Jayce's "eyes were rolling in the back of his head," so "he shook him to keep him awake.". Fifteen minutes into the interview, Scott was advised of his rights under *Miranda* for the

---

[2] A video recording of the conversation from the officer's body camera was admitted into evidence and played for the jury.

first time. After being advised of his rights, Scott told the same story again, including that he had shaken Jayce.

While being treated in the hospital, a CT scan showed that Jayce had bilateral subdural hematoma.[3] Because of the seriousness of the injuries, Jayce was taken to Children's Healthcare of Atlanta. Three days later, he was taken off life support and passed away. The medical examiner who conducted the autopsy determined that Jayce's injuries included bleeding on the surface of the brain, apparent contusion of the brain, a swollen brain, and evidence of lack of oxygen to the neurons.

At trial, Dr. Verena Brown, one of the State's medical experts, testified that Jayce's injuries were inconsistent with what you would see from gently shaking a child but rather, "[h]is condition was most consistent with abusive head trauma" and choking could not have caused his injuries. Contrary to Scott's telling of events, Dr. Brown said that "[f]rom a medical standpoint, it makes the most sense that

---

[3] "Bilateral subdural hematoma… are two small bleeds in the skull outside the brain."

[Jayce] would have been shaken before his symptoms occurred." Dr. Lora Darrisaw, who performed Jayce's autopsy, testified that she certified the manner of death as a homicide, as her opinion was that Jayce's injuries "were not sustained accidentally." Rather than choking being a possible explanation for the injuries, Dr. Darrisaw stated that the choking would have been a symptom of the brain bleed. The defense presented several experts who opined that Jayce's injuries were consistent with Scott's version of events and that some of Jayce's injuries could have resulted from emergency treatment at the hospital.

1. Scott first contends that the statements he made in the interview with Detective Marrero should have been suppressed because he was not advised about his rights under *Miranda*. At the *Jackson-Denno* hearing,[4] Detective Marrero testified that an officer brought Scott for an interview after Scott gave a statement at the hospital. Although Scott was in handcuffs during transport for safety reasons, the handcuffs were removed before the interview,

___

[4] See *Jackson v. Denno*, 378 US 368 (1964).

and Detective Marrero testified that he told Scott that he was free to leave.[5] Detective Marrero also testified that fifteen minutes into the interview, he became concerned that Scott may have committed a criminal act, so he advised Scott of his rights under *Miranda*. Scott also completed a waiver form outlining his rights. After the interview, Scott left the police department, and an officer drove him back to his house. At the close of the hearing, the trial court orally found that the interview "was freely and voluntarily given by him in response to a non-custodial discussion about the case with him as a witness at the time."[6]

Scott argues that he was in custody during the interrogation and should have been advised of his rights under *Miranda*.

---

[5] The recording from the interview, portions of which were played at trial, does not include that statement.

[6] Although a recording was made of the interview, the recording was not introduced into evidence at the *Jackson-Denno* hearing and was not considered by the trial court in rendering its decision. However, this Court can consider evidence presented at trial in reviewing the motion to suppress even though that evidence was not before the trial court at the motion to suppress hearing. See *Jones v. State*, 314 Ga. 605, 609 (2022) ("In so construing the evidence [in reviewing the findings of a trial court regarding a motion to suppress], this Court can consider the pretrial testimony adduced at the suppression hearing, as well as the trial transcript.").

6

Moreover, Scott claims that he was in no condition to voluntarily waive his rights, as he was emotionally distraught, separated from his family, placed alone in an interrogation room, and questioned without food, sleep, or legal counsel. For these reasons, Scott argues that the statements he made during the interview should have been suppressed.

A person "is considered to be in custody and *Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary." *Acosta v. State*, 311 Ga. 320, 325 (2021) (cleaned up). This Court reviews a ruling on a motion to suppress as follows:

> First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most

7

favorably to the upholding of the trial court's findings and judgment.

*Jones v. State*, 314 Ga. 605, 609 (2022) (citation omitted).

Here, despite Scott's claim that he was not advised of his rights under *Miranda*, the record supports the trial court's finding that Scott was advised of his rights about fifteen minutes into the interview. Thus, our analysis will focus on whether a reasonable person in Scott's position would have believed that he was in custody during that time. The record shows that Scott was not formally arrested, voluntarily accepted a ride to the police station to provide a statement, was not in handcuffs during the interview, and – as found by the trial court – "was free to leave at any point." After the interview, Scott was, in fact, allowed to leave, and he was driven home. Therefore, the record supports the trial court's finding that a reasonable person in Scott's position would not believe that he was in custody during the first fifteen minutes of his interview such that the trial court did not err in concluding that Scott was not in custody for *Miranda* purposes and in denying the motion to suppress. See

*Acosta,* 311 Ga. at 325 (concluding under totality of the circumstances that suspect was not in custody for *Miranda* purposes when suspect voluntarily agreed to talk to officers and allowed one of the officers to drive him to the station, the suspect was not restrained, and the trial court found that the suspect was free to leave at any time); *Drake v. State,* 296 Ga. 286, 289 (2014) (defendant was not in custody for purposes of *Miranda* where he agreed to accompany the officers for an interview with the understanding that he would be returned to his workplace afterwards, he was not handcuffed or physically restrained during the interview, and the interview was conducted in a calm, non-confrontational tone). Accordingly, this claim fails.

2. Scott also contends that the trial court erred in admitting evidence of prior difficulties with Jayce, as shown by a video recording from an officer's body-worn camera, without a *Crumbley* hearing[7] or limiting instruction.

---

[7] Scott is referring to *Crumbley v. State,* 267 Ga. 354 (1996), a case under the old Evidence Code about the need to provide notice of prior difficulties and

The prior difficulty evidence in question involved an incident that occurred in November 2019, two months before Jayce's death. Jayce's mother had dropped Jayce off at Scott's house on a Friday afternoon after picking Jayce up from daycare. When she picked him up from the daycare, Jayce had no marks on him. However, when she returned to Scott's house on Sunday, Jayce had a cigarette burn on his foot, scratches on his back, and red marks on his face. Several days later, she reported the injuries to law enforcement. The evidence at issue is bodycam footage from Corporal Chase Phelps, the responding officer who spoke with Jayce's mother about the injuries; the video recording also showed Jayce and his injuries. Prior to the start of trial, counsel for both parties raised with the court whether the bodycam footage would be admissible, and after a

---

for the trial court to hold a hearing to determine admissibility. However, "[c]ases addressing the admissibility of evidence of 'prior difficulties' decided under the old Evidence Code do not apply in cases controlled by the current Evidence Code." *Flowers v. State*, 307 Ga. 618, 620 (2020). Instead, the admission of other-acts evidence is now governed by OCGA § 24-4-404(b). See OCGA § 24-4-404(b) ("Notice shall not be required when the evidence of prior crimes, wrongs, or acts is offered to prove the circumstances immediately surrounding the charged crime, motive, or prior difficulties between the accused and the alleged victim.").

brief discussion, the trial court ruled that the evidence would be admissible with a limiting instruction. Defense counsel asked for and was allowed a continuing objection.

At trial, the State called Jayce's mother during its case-in-chief, and she testified without objection that when picking Jayce up that Sunday in November 2019, she noticed a burn on his nose, on the bottom of his feet, and scratches on his back. She stated that Scott blamed it on the daycare even though when she picked Jayce up from daycare that Friday, she did not see any marks. During Corporal Phelps's testimony, the State played the bodycam footage for the jury. The officer also testified without objection about photographs that he took of Jayce's injuries. In addition, Dr. Brown, who was qualified as an expert in the field of child abuse pediatrics, read, without objection, from a portion of her report that noted that Jayce's mother had previously reported to police that Scott had injured Jayce and that the police had taken photographs of Jayce's injuries.

On appeal, Scott argues that the trial court improperly

admitted the bodycam footage and that the evidence was prejudicial because it was emotionally charged, irrelevant to the charged offenses, and improperly influenced the jury's perception of Scott's character. However, assuming without deciding that admission of the bodycam footage was improper, any error in its admission was harmless. "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done. The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Boone v. State*, 321 Ga. 820, 827 (2025) (cleaned up).

Here, the bodycam footage was cumulative of the testimony of Jayce's mother, Corporal Phelps, and Dr. Brown. Jayce's mother testified about the circumstances under which she concluded that Scott had previously injured Jayce, which Dr. Brown also recounted in her report and read at trial. Corporal Phelps also testified about the injuries that Jayce appeared to have. Because the bodycam footage was cumulative of other unchallenged evidence presented at

12

trial, it is highly probable that any error in its admission did not contribute to the verdict. See *Virger v. State*, 305 Ga. 281, 296 (2019) ("[E]ven assuming that some portion of [evidence] … should not have been admitted, that evidence was harmless. The jury heard and saw substantial other evidence … [that] was largely cumulative."); *Kirby v. State*, 304 Ga. 472, 487 (2018) (holding that error in admitting evidence of a prior violent crime under 404(b) was harmless as other evidence admitted at trial meant the jury was already aware of previous violent crimes committed by the defendant); *Douglas v. State*, 303 Ga. 178, 183 (2018) (reasoning that any error in the admission of 404(b) evidence was harmless because it was cumulative of facts established by other evidence).

3. Finally, Scott contends that the trial court abused its discretion in denying his motion for new trial because the verdict is strongly against the weight of the evidence and contrary to the principles of justice and equity. We disagree. The court in its order denying the motion for new trial stated, "[u]pon an independent review of the evidence presented, the credibility of the witnesses

13

who testified, the conflicts in the evidence that existed, and the weight of the evidence," that "the jury's verdict is in accord with the evidence, the principles of justice and equity, and the Court's own independent review under the provisions of the common law and the practice of the courts. O.C.G.A [§§] 5-5-20, 5-5-21, 5-5-25; *Burney v. State*, 299 Ga. 813, 815 (2016)." Because the trial court cited the correct legal standards, weighed the evidence, and found that the evidence supported Scott's guilt, the record shows that the trial court exercised its discretion as the "thirteenth juror." See *Thomas v. State*, 311 Ga. 573, 576 (2021) ("To the extent that [the Defendant] argues that the trial court failed to exercise its discretion as the "thirteenth juror," the record shows otherwise. In denying [the Defendant's] motion for new trial, the trial court cited the correct legal standards, weighed the evidence, and found that the evidence overwhelmingly supported [the Defendant's] guilt."). And to the extent that Scott argues that the trial court exercised its discretion improperly, this argument presents nothing for us to review because only trial courts have discretion to sit as the "thirteenth juror." See

14

id.

*Judgment affirmed. All the Justices concur.*