NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 22, 2022

S22A0441. RAYTON v. THE STATE.

ELLINGTON, Justice.

A Fulton County jury found Joe Rayton guilty of murder in the shooting death of Antonio Ladson.[1] Rayton contends that the trial court erred by refusing his request for a jury instruction on voluntary manslaughter. Additionally, Rayton contends that he was

---

[1] The shooting occurred on May 20, 2016. On March 31, 2017, a Fulton County grand jury indicted Rayton, charging him with malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); felony murder predicated on possession of a firearm by a convicted felon (Counts 3 and 4); aggravated assault with a deadly weapon (Count 5); possession of a firearm during the commission of a felony (Count 6); possession of a firearm by a convicted felon (Count 7); and possession of a firearm by a convicted felon during the commission of a felony (Count 8). At a trial that ended on May 1, 2019, the jury found Rayton guilty on all counts. On May 22, 2019, the trial court sentenced Rayton to serve life in prison without parole on Count 1, and 15 years in prison on Count 8. Counts 2, 3, and 4 were vacated by operation of law, and the remaining counts merged for purposes of sentencing. Rayton filed a timely motion for new trial, which he amended on December 1, 2020, and on August 30, 2021. After a hearing, the trial court denied the motion on October 19, 2021. Rayton filed a timely notice of appeal, and the case was docketed in this Court to the April 2022 term and submitted for a decision on the briefs.

denied effective assistance of counsel by his trial counsel's objection to a jury instruction requested by the State regarding accomplice corroboration and by counsel's failure to object to the prosecutor's statement during closing argument that Rayton's own testimony admitting that he shot Ladson during an attempted drug deal precluded a self-defense verdict. For the reasons explained below, we affirm.

Pertinent to Rayton's arguments on appeal, the evidence presented at trial showed the following. Joe Adams, Rayton's son, testified as follows. In early May 2016, Ladson accused Adams of stealing about $100 to $125 worth of drugs from a house where Ladson and his partner, Sacarri Dodson, sold drugs. Ladson repeatedly called Adams and left voice messages and sent text messages threatening to kill his family. In those messages, Ladson said that he knew where Adams, Rayton, Adams's aunt, and his grandmother lived and where Rayton's wife, Wendy, worked. Ladson also told Adams that he had "shot up" Rayton's house. Adams showed the texts to Rayton and to Wendy. On May 19,

Ladson encountered Rayton and beat him up. At about 1:00 a.m. on May 20, Adams, Rayton, and Darrius Winfield travelled from Rayton's home in Ellenwood to Elmwood Road in Atlanta, where Rayton intended to buy cocaine as he had done there before. Winfield drove Rayton's car; Rayton sat in the front and directed Winfield where to go; Adams sat behind Rayton. Rayton told Adams he wanted to "stop and go see Corey [Smith]." When they reached Elmwood Road, Rayton told Winfield to stop behind a red car parked on the side of the road that Rayton said was Smith's car. Rayton walked from his car to the driver's window of the red car, taking a jar of marijuana, and called out, "Corey, I got something for you." When Rayton looked in the window, he frowned. Rayton leaned on the car and started talking to Ladson, whom he addressed as "Tony" and who was sitting in the driver's seat. After some conversation, they started to argue. Rayton then opened the jar and showed Ladson the marijuana. Ladson reached down in his car "like he was grabbing something." Rayton jumped back, threw the jar of marijuana into Ladson's car, and pulled a gun out of his pocket.

3

Rayton fired five or six times in Ladson's direction. Rayton started crying, looked to the sky, and said, "I'm sorry. I f***ed up." Winfield, Rayton, and Adams left in Rayton's car. Later that morning, Adams gave the gun Rayton used to shoot Ladson to Wendy and told her to throw it away.

Rayton testified as follows. He read the May 2016 text messages from Ladson to Adams about Adams's supposed debt for stealing drugs from Ladson, messages that Rayton took as threatening to him and his family. In the following days, Rayton encountered Ladson, who told him, "I shot your house up." On May 19, Rayton again encountered Ladson, who handed Rayton a phone, made him dial his mother's number, took the phone when she was on the line, and threatened to kill her or Rayton if he did not get the money Adams owed him. Before these events, Ladson had threatened Rayton with a gun two times. Once, Ladson drove Rayton's car without permission, and, after Rayton threatened to call the police if he did not return it, Ladson pointed a gun at Rayton and said he would kill Rayton if Rayton turned him in to the police.

4

The second time, Rayton witnessed an incident when Ladson claimed a woman had his drugs, shot at her foot, hit her repeatedly with his pistol, and put the pistol in her mouth. Rayton testified that he tried to intervene, and Ladson told Rayton to stay out of his business and pointed his gun at him.

Rayton testified about shooting Ladson as follows. At about 1:00 a.m. on May 20, 2016, he asked Adams and Winfield to go with him to Elmwood Road, where he had been purchasing drugs for several years, so he could purchase cocaine from Ladson's cousin, Corey Smith. On Elmwood Road, they parked behind a red and black car he believed to be Smith's "red and black Monte Carlo Impala." While Winfield and Adams stayed in the car, Rayton walked up to the driver's side of the Impala calling out "Corey" and "Nephew;" he had Wendy's pistol in his pocket and was holding a jar of marijuana that he intended to exchange for cocaine. He also had money in his pocket. The driver of the Impala lowered the window, and, when Rayton saw that it was Ladson and not Smith, his "heart . . . dropped," and he froze in fear. Ladson, who was having a

5

conversation on his cell phone, told the other person to hold on and put the phone in his lap. Ladson said to Rayton, "You got my motherf***ing money? Didn't I tell you earlier, if you ain't got my motherf***ing money, I'm going to kill you?" Ladson snatched the jar of marijuana out of Rayton's hand, and repeated his demand for money and his threat. After Rayton told Ladson he had no money, Ladson "reached up under the seat." Because Ladson had just threatened to kill Rayton and had threatened his family in the previous weeks, because he had seen Ladson "do bodily harm to people," and because he knew that Ladson "carr[ied] a gun on him at all times," Rayton was so afraid for his life that he urinated on himself. Rayton reached into his pocket for his pistol, just as Ladson "came up" with "an object in his hand," "something black," and Rayton "blanked" and "just started shooting." In his testimony, Rayton repeated many times that his life was in danger and that he was scared when he started shooting Ladson. After the shooting, Rayton left with Adams and Winfield, and returned to Rayton's house. Rayton decided to spend the night in a hotel, because he was

6

afraid Ladson's cousin and other fellow gang members "were going to come and kill [him]."

Winfield testified that he drove Rayton's car that night; he stopped, as instructed, behind a red car; Rayton got out, holding a jar half full of loose marijuana, exchanged a few words with the man sitting in the red car, reached into the car with the jar of marijuana in what looked to be part of a drug transaction, "and then [Rayton] shot the man." Shandra Atkins testified that, in May 2016, she was occasionally staying at Winfield's home, along with Adams and his sister. Before the shooting, Atkins was aware that Ladson was making threats to Rayton's family "because [Rayton] owed [Ladson] some money for some powder" after Adams robbed the "trap spot" where Ladson sold drugs and where Rayton sometimes bought drugs. Adams told Atkins that Rayton told him that "[Rayton] was going to have to end up killing [Ladson] . . . because "[Rayton] was in fear [for] his family and his livelihood [from] the threats that were being made." In the weeks after the shooting, Adams told her what happened to Ladson. Adams said that, on the night of the shooting,

7

Winfield drove Rayton and Adams, and Rayton had a jar of marijuana that he was supposed to give Ladson. According to Adams, Rayton "basically threw the jar to [Ladson] . . . to distract him" and "that is when he shot and killed him" using a gun that belonged to Wendy.

Wendy testified that Adams handed her gun to her on the morning of the shooting and told her to get rid of it. She testified that she gave the gun to a friend, who gave it to the lead detective in the Ladson murder investigation. A firearms examiner testified that Wendy's gun, a Taurus .40-caliber pistol, had fired three .40-caliber cartridge cases and two .40-caliber bullets that investigators had collected from in and around the car in which Ladson was shot. The detective testified that other evidence collected from that car, a red Impala, included a glass jar, loose marijuana scattered over the back seat, cocaine packaged for sale, and a quantity of cash. A medical examiner testified that Ladson died from gunshot wounds to the torso.

1. Rayton contends that the trial court erred by refusing his

request for a jury instruction on voluntary manslaughter as a lesser offense of murder. His contention fails because the evidence did not warrant such an instruction.

Voluntary manslaughter is the killing of another person under circumstances that would otherwise be murder when the killer

> acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

OCGA § 16-5-2 (a). "A trial court is required to give a requested charge on voluntary manslaughter if there is slight evidence of the elements of OCGA § 16-5-2 (a)." *Hatney v. State*, 308 Ga. 438, 441 (2) (841 SE2d 702) (2020). "A charge on voluntary manslaughter is not available to a defendant whose own statement unequivocally shows" that he used force against the victim "simply in an attempt to defend himself" and when no other evidence shows that, when the killing occurred, the defendant was "angered or impassioned" by

9

provocative conduct by the victim. *Tarpley v. State*, 298 Ga. 442, 445 (3) (a) (782 SE2d 642) (2016) (citations omitted). See also *Collins v. State*, 312 Ga. 727, 739 (6) (864 SE2d 85) (2021) ("To warrant a jury charge on voluntary manslaughter, there must be at least slight evidence that the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself." (citation and punctuation omitted)); *Smith v. State*, 296 Ga. 731, 737 (3) (770 SE2d 610) (2015) ("[N]either fear that someone is going to pull a gun nor fighting are the types of provocation which demand a voluntary manslaughter charge."). "Whether the defendant presented any evidence of provocation sufficient to excite the passions of a reasonable person is a question of law." *Davenport v. State*, 311 Ga. 667, 672 (3) (859 SE2d 52) (2021).

Here, Rayton argues that his trial testimony supported not only a self-defense theory but, alternatively, the theory that Ladson's threatening words just before the shooting, combined with his previous violent conduct that Rayton had witnessed and Ladson's terror campaign against Rayton and Rayton's family,

amounted to a serious provocation that caused Rayton to react passionately. To that end, Rayton points to his testimony that Ladson had previously stolen his car, shot at his home, pointed a gun at him, threatened to kill him, threatened to kill his close family members, physically assaulted him the previous day, and, when he unexpectedly encountered Ladson in the middle of the night, continued to threaten to kill him and his family. But Rayton never testified that he was angry or inflamed by Ladson's conduct just before the shooting — only that he was scared and was defending himself (as well as his family). And there was no other evidence that the shooting was the result of a sudden, violent, and irresistible passion. Rayton has failed to point to even slight evidence that he reacted passionately to Ladson's conduct rather than simply in an attempt to defend himself. Consequently, the trial court did not err in refusing to give a jury charge on voluntary manslaughter. See *Collins*, 312 Ga. at 739-740 (6) (There was not even slight evidence to support a jury instruction on voluntary manslaughter where the defendant testified that the victim called him a "motherf***er" to his

11

face, threatened to kill him, and pulled a handgun on him, but the defendant "never testified that he was angry or mad or that he had any other response showing he might have reacted passionately — only that he was scared and was defending himself (as well as [his companion])."); *Beck v. State*, 310 Ga. 491, 496-497 (2) (852 SE2d 535) (2020) (There was not even slight evidence to support a jury instruction on voluntary manslaughter where the defendant testified that he was "just scared" and acting in defense of himself, his girlfriend, and her family when he shot the victim, even where there was evidence that the defendant knew the victim to carry a gun, that the victim had threatened the defendant days prior to the shooting, and that the defendant believed the victim was about to shoot or strike the defendant's girlfriend just before the defendant shot him.); *Tarpley*, 298 Ga. at 444-445 (3) (a) (There was not even slight evidence to support a jury instruction on voluntary manslaughter where the defendant's statements and testimony did "not indicate that he killed [the victim] out of some irresistible passion — whatever the source of that passion — but, instead, that

12

the killing occurred because [the defendant] was 'very afraid' of [the victim] that night.").

2. Rayton contends that he was denied the effective assistance of counsel because his attorney objected to the State's requested jury instruction that an accomplice's testimony must be corroborated and failed to object to the prosecutor's closing argument.

To establish ineffective assistance of counsel, a defendant must show that his trial counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U. S. 668, 687 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984). The defendant must also show that the deficient performance prejudiced the defense, which requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694 (III) (B). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. If an appellant fails to show either deficiency or

13

prejudice, this Court need not examine the other prong of the *Strickland* test. See *Hooper v. State*, 313 Ga. 451, 455 (1) (870 SE2d 391, 396) (2022).

(a) Rayton contends that his trial counsel rendered ineffective assistance by objecting to the State's requested jury instruction that an accomplice's testimony must be corroborated.[2] At the hearing on Rayton's motion for a new trial, his trial counsel testified that he did not want that instruction given because, in the defense's framing of the evidence, there was no intent to travel to Atlanta to kill Ladson and no plan or conspiracy, and, therefore, there were no accomplices.

"Decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Thomas v. State*, 311 Ga. 706, 714 (2) (a) (859 SE2d 14)

---

[2] See OCGA § 24-14-8 (In "felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness[.]"). The State requested the pattern instruction. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.31.92 (4th ed., 2022).

14

(2021) (citation and punctuation omitted). In particular, the decision about "which jury charges to request [is a] classic matter[ ] of trial strategy[.]" Id. (citations and punctuation omitted). Here, defense counsel's decision to object to the accomplice charge was consistent with an objectively reasonable defense strategy of avoiding labeling Adams, who was not charged with any crime in connection with the shooting, as an accomplice, because identifying Adams as an accomplice would have undermined Rayton's claim that he was surprised to encounter Ladson that night. Because Rayton has not shown that his counsel's performance was constitutionally deficient, as required by *Strickland*, the trial court did not err in denying Rayton's motion for a new trial on this ineffective assistance of counsel ground. See *Thomas*, 311 Ga. at 714 (2) (a); *Walker v. State*, 296 Ga. 161, 171 (3) (b) (766 SE2d 28) (2014).

(b) Rayton also contends that he was denied effective assistance by his trial counsel's failure to object when the prosecutor told the jury during closing argument that Rayton's own testimony precluded a self-defense verdict.

15

During the State's closing argument, the prosecutor argued that the jurors could

> only think about this case in two ways. . . . Either . . . Rayton was going down there to buy drugs, or he went down there knowing that he [was] going to murder . . . Ladson. . . . [Either] way you think about it, it's still murder. And this is why – and this is the law: a person is not justified in using self-defense if that person is attempting to commit [or] is committing . . . a felony. The purchase and sale of cocaine is a violation of Georgia's Controlled Substances Act, and that is a felony here. . . . You don't get to go commit felonies or attempt to commit felonies and then claim self-defense. . . . So if you believe that . . . Rayton went down there to buy drugs, this analysis is over because you do not get self-defense.

Rayton's trial counsel did not object to this line of argument. At the motion for new trial hearing, counsel testified that he did not object to the prosecutor's statement because he saw no basis for objecting and felt there was evidence to support the argument.

The first view of the evidence suggested by the prosecutor, that Rayton traveled to Atlanta for the purpose of killing Ladson, was a reasonable inference based on the evidence, including evidence that Rayton had recently said that he was going to have to kill Ladson because he was in fear for his family and his livelihood due to the

threats Ladson had been making and evidence that, armed with Wendy's gun, he went to an area on Elmwood Road where Ladson was regularly known to be found selling drugs. Where, as in this case,

> a prosecutor's closing argument was based on permissible inferences and legitimately supported by the facts in evidence, an objection to the argument on the ground that the prosecutor was mischaracterizing the evidence would have been meritless, and counsel's failure to make such an objection therefore is not evidence of ineffective assistance.

*Fisher v. State*, 309 Ga. 814, 822 (4) (848 SE2d 434) (2020) (citation and punctuation omitted).

The alternative view suggested by the prosecutor, that Georgia law precluded Rayton from claiming self defense because he traveled to Atlanta for the purpose of buying cocaine, was a fair paraphrase of applicable law that the trial court charged the jury and was supported by Rayton's own testimony and by other evidence at trial. The purchase of cocaine is a felony. See OCGA §§ 16-13-26 (1) (D); 16-13-30 (a), (c). Under applicable law, a defendant may not claim self defense when his use of force admittedly occurs during the

17

attempted commission of a felony. Under OCGA § 16-3-21 (a) and

(b),

> a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony. . . . A person is not justified in using force under [such] circumstances . . . if he . . . [i]s attempting to commit . . . a felony[.3]

"[C]ounsel have every right to refer to applicable law in argument; it is law that the court will *not* charge the jury that counsel is prohibited from presenting." *Perez v. State*, 309 Ga. 687, 695-696 (848 SE2d 395) (2020) (citation omitted; emphasis in original).

We are unpersuaded by Rayton's argument that the evidence

---

[3] In this regard, the trial court instructed the jury:
The State has the burden of [proving] beyond a reasonable doubt that the defense was not justified. A person is not just [sic] in using force if this person, (a) initially provokes the use of force against himself or herself with the intent to use such force as an excuse to inflict bodily harm upon the assailant; or (b) is attempting to commit, is committing, or is fleeing after . . . the commission or attempted commission of a felony, to wit, an alleged attempt to purchase cocaine, a violation of the Georgia Controlled Substances Act, said alleged act being a felony.
See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.10.10 (4th ed., 2022).

18

established that he was not attempting to buy cocaine when he shot Ladson. Rayton argues that "[a]ttempt requires a subjective belief that a crime is factually possible," citing to OCGA § 16-4-4, which provides that it is no defense to a charge of a criminal attempt that the crime was impossible under the attendant circumstances if the crime would have been possible under circumstances "as the accused believed them to be."[4] Based on this reading of OCGA § 16-4-4, Rayton contends that "any 'attempt' to purchase crack-cocaine ended as a matter of law . . . when [he] saw Ladson [in the car]," instead of Smith, because he then "became subjectively aware that he could not purchase crack-cocaine in the manner he intended[,]" that is, from Smith. The jury was not required, however, to believe Rayton's testimony that he did not attempt to buy drugs from Ladson. The evidence, including Rayton's own testimony, showed

---

[4] In full, OCGA § 16-4-4 provides:

It is no defense to a charge of criminal attempt that the crime the accused is charged with attempting was, under the attendant circumstances, factually or legally impossible of commission if such crime could have been committed had the attendant circumstances been as the accused believed them to be.

that he went to Elmwood Road to buy cocaine and that he approached Ladson's car with money in his pocket and with a jar of marijuana that he intended to exchange for cocaine. Both Winfield and Adams testified that it looked like Rayton was commencing a drug deal with Ladson before Rayton shot him. Rayton has failed to show that his attempt to purchase cocaine before he shot Ladson fell within the statutory definition of impossibility. Cf. *Guzman v. State*, 206 Ga. App. 170, 172 (2) (424 SE2d 849) (1992) (holding that the appellant's actual inability to complete a drug purchase because she had no money with her fell within the definition of impossibility set forth in OCGA § 16-4-4).

Accordingly, the evidence warranted the court's charge that a person is not justified in using force if the person is attempting to commit a felony and that attempting to purchase cocaine is a felony under Georgia law; the prosecutor's argument referred to applicable law that the court did include in its jury charge; and an objection to the argument on the ground that the prosecutor was mischaracterizing the law would have been meritless. Counsel's

20

failure to make such an objection therefore was neither professionally deficient nor prejudicial. See *Perez*, 309 Ga. at 695-696; *Varner v. State*, 306 Ga. 726, 734-735 (3) (c) (832 SE2d 792) (2019).

*Judgment affirmed. All the Justices concur.*