NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 10, 2024

S24A1354.  HAYES v. THE STATE.

BOGGS, Chief Justice.

Appellant Jarrod James Hayes challenges his convictions for malice murder and other crimes in connection with the shooting death of Zedekiah Jones. Appellant contends that the trial court erred in denying his motion to suppress three firearms that were discovered at his home after he disclosed their existence and location in a statement that was not preceded by warnings required by *Miranda*.[1] He also asserts that he was denied the effective assistance of counsel; that the trial court abused its discretion by allowing a witness's video-statement to be played after the witness claimed not to recall the statement; that the trial court erred by refusing to bifurcate his malice murder and aggravated assault

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

counts from his three felon-in-possession counts; that the trial court erred by refusing to give jury instructions on voluntary manslaughter and mutual combat; and that the combined prejudicial effect of the multiple errors of the trial court and multiple deficiencies of trial counsel requires a new trial. We conclude that because the statement given without *Miranda* warnings was voluntary, the firearms were admissible. We also conclude, for the reasons set forth below, that his other claims fail. Accordingly, we affirm.[2]

---

[2] The crimes occurred on January 17, 2020. On January 31, 2020, a Douglas County grand jury indicted Appellant for malice murder, aggravated assault, two counts of felony murder, three counts of possession of a firearm by a convicted felon, and possession of less than an ounce of marijuana. The marijuana-possession count was nolle prossed, and at a trial from February 15 to 22, 2022, the jury found Appellant guilty of all charges. The trial court sentenced Appellant to serve life in prison without the possibility of parole for malice murder and three terms of five years imprisonment each for the weapons charges, running concurrently with each other. The felony murder verdicts were vacated by operation of law, and the trial court merged the aggravated assault count into the malice murder conviction. On March 14, 2022, Appellant timely filed a motion for new trial, which he amended with new counsel on April 24, 2023. After an evidentiary hearing on June 22, 2023, the trial court entered an order denying the motion on May 9, 2024. Appellant filed a timely notice of appeal, and the case was docketed in this Court to the August 2024 term and submitted for a decision on the briefs.

1. The evidence presented at trial showed the following.[3] On January 16, 2020, Zedekiah Jones and his wife, McKeda Jones, traveled from Utah to Atlanta, Georgia, for Zedekiah's grandmother's funeral. When they arrived in Atlanta, they rented a car at the airport, went shopping, and then drove to Quincy Sims's father's home near the West End neighborhood. Sims and Zedekiah had been friends for several years. While at Sims's home, Zedekiah, McKeda, Sims, and other friends and family were "drinking and barbecuing." Zedekiah, McKeda, and Sims remained there until around 11:00 p.m., at which point they decided to go "holler at" Appellant, who lived in Douglasville, Georgia. Zedekiah, Sims, and Appellant had all been friends for several years. Zedekiah, McKeda, and Sims arrived at Appellant's home on Viola Court in Douglas County between 11:00 p.m. and midnight. When they arrived, Appellant, his wife Rose Hayes, and their four children were at the

---

[3] Because this case involves questions of harmless error and prejudice under *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984), we set out the evidence in detail, rather than recounting it in the light most favorable to the jury's verdicts. See *Moore v. State*, 315 Ga. 263, 264 n.2 (882 SE2d 227) (2022).

home. The five adults began drinking and playing pool in the basement for several hours. Rose was smoking marijuana, while Zedekiah and Sims each consumed a pill that McKeda suspected was Ecstasy. Sims, however, testified that the only drug he had in his possession the night of the shooting was Percocet. Sims was also under the influence of cocaine and Percocet the following day when he was interviewed by investigators.

At 3:17 a.m. on January 17, Sims recorded and uploaded a video to Instagram of the five adults socializing and playing pool in the basement. At 4:09 a.m., Sims recorded and uploaded another Instagram video, this time of Zedekiah, who also went by "Tenarus," asleep in the upstairs bathroom of the home. In the video Sims can be heard saying, "We been looking for [Zedekiah] for the last thirty minutes." After finding Zedekiah, Sims and Appellant helped Zedekiah into the upstairs bedroom, where Zedekiah joined McKeda, who was already lying on the bed asleep. At some point, Rose joined Zedekiah and McKeda on the bed. All three were fully clothed.

4

At 4:34 am, Sims recorded and uploaded a final video to Instagram showing Zedekiah, McKeda, and Rose on the bed, with Zedekiah in the middle. Zedekiah and Rose can be heard on the video talking aggressively to each other. Fifteen minutes after the final video, Rose pushed Zedekiah to the ground, and in response, McKeda attacked Rose, biting her over her eye.[4] While Sims helped Zedekiah off the ground, Appellant intervened to defend Rose against McKeda. Seeing this, Zedekiah got involved in the altercation and began to fight Appellant. Sims attempted to separate the couples, but in the process of doing so, he heard someone reference a gun and noticed Appellant was no longer in the room. Sims also heard someone say, "[G]et these people" out of my house.[5] Upon hearing the reference to a gun and seeing Appellant was no longer in the room, Sims immediately left the home.

After Sims left, the struggle between the couples continued.

---

[4] McKeda and Rose were arrested and charged with multiple counts of battery.

[5] Sims testified that he was "not a hundred percent about who said what."

McKeda, whose version of events leading up to and during the struggle differed from Sims's, testified that Rose was "fighting me from behind and she's biting me. She was taking her hands and putting them in my eyes trying to hold me back and pulling my hair and stuff." While Rose attacked McKeda, McKeda attempted to crawl over to Zedekiah, who was being punched in the eye by Appellant. Eventually, Rose stopped attacking McKeda, and McKeda crawled over to an unresponsive Zedekiah. As McKeda urged Zedekiah to "[g]et up," Appellant "[shot] Tenarus" once. McKeda did not remember what type of gun Appellant used to shoot Zedekiah because she claimed she did not "know guns." However, there was evidence that McKeda took a photo with a firearm, which was unrelated to Zedekiah's killing, on her lap prior to the day of the shooting. There was no evidence presented to suggest that she brought that firearm, or any other firearm, to Appellant's home.

At 4:39 a.m., video footage from a camera above the garage of a neighboring home on Willow Ridge Road, which is adjacent to Viola Court, showed an individual walking away from the direction

6

of Appellant's home and sitting on a curb.[6] Also, around this time, an unidentified dark-colored vehicle drove toward the direction of Appellant's home and drove back from that direction around two minutes later. At 4:42 am, the garage camera recorded what sounded like a gunshot. A neighbor also testified that he heard multiple gunshots the morning of the incident.

At 4:44 a.m., Rose called 911 stating, among other things, that her "husband [was] fighting for his life" and that a woman bit Rose while Rose was asleep. Through an enhanced version of Rose's 911 call that was played for the jury at trial, an investigator testified that "he believed" Appellant could be heard telling Rose, "I am going to jail for murder. I love you." At 4:45 a.m., Appellant called his brother, but the substance of that conversation is unknown. Around two minutes later, Appellant called 911, reporting that Zedekiah had been shot by someone in a black Dodge Charger and requesting that deputies immediately help Zedekiah. Appellant also relayed

---

[6] Investigators later confirmed that this person was Sims.

instructions on how to perform CPR from the 911 operator to McKeda. Neither McKeda nor Sims called 911.

At 4:57 a.m., Deputy Anna Stone of the Douglas County Sheriff's Office arrived on scene and found Zedekiah lying on his back, with a gunshot wound to the chest, in a pool of "coagulated" blood[7] near the front entrance of the home. McKeda was hysterically crying over Zedekiah's body, and Appellant, who was shirtless, stood on the stairs leading to the upper level of the home. Deputy Stone asked Appellant where the shooter was, and he responded that "[the shooter] left in a black Dodge Charger." Deputy Stone transmitted this information over the radio so that responding units could keep a look out for a black Dodge Charger.

As Deputy Stone performed life-saving procedures on Zedekiah and other deputies arrived, Sims came up the stairs from the basement and attempted to step over Zedekiah. Deputies ordered

---

[7] While responding deputies described the blood as "coagulated," suggesting that it had been there "for a while," the medical examiner testified that coagulation refers to "blood clotting within the body," and would not apply to blood that is on the floor.

Sims to stop moving, prompting him to return to the basement and exit through the basement door. Deputies searched the home and surrounding area for Sims but were unable to locate him that morning. Sims, who was incarcerated at the time of his testimony for violating his parole involving a previous conviction for aggravated assault with a firearm, testified that he went back to the home to "see what was going on" because he heard gunshots and left his cell phone.

Paramedics arrived and transported Zedekiah to a hospital, where he died later that day. Rose was also transported to the hospital because of an injury to her eye. Once paramedics left, deputies began to question McKeda and Appellant. Deputy Stone supervised McKeda while McKeda, whom Deputy Stone believed to be intoxicated, completed a written witness statement, and another deputy did the same with Appellant. In Appellant's written statement, he maintained that someone in a black Dodge Charger argued with, fought, and shot Zedekiah. However, McKeda's statement noted, and she also testified, that there was no person in

9

a black Dodge Charger and that Appellant shot Zedekiah.

After Appellant completed his written statement, he was placed in handcuffs, put in the back of a patrol car, and then later moved to a different patrol car. Investigators arrived on scene at approximately 6:00 a.m. After conducting a brief walk-through of the scene, investigators left and went to the sheriff's office to interview McKeda at 6:56 a.m. During that interview, she again stated that Appellant shot Zedekiah. At that point, investigators refocused their attention on Appellant.

The medical examiner testified at trial that Zedekiah's death was due to a gunshot wound to the abdomen.[8] In addition to the gunshot wound, the autopsy report indicated that Zedekiah suffered several injuries that occurred close in time to his death. Those injuries included a black eye, bruising to the top of his head, arms, face, hands, and neck, and bleeding of the whites of his eyes. The

---

[8] The crime scene investigator testified that by using trajectory rods they were able to determine that the shooter "was possibly standing on the stairs that lead to the lower level of the home, and the shots were coming from that direction going out of the house . . . towards the front door."

medical examiner could not say specifically what caused Zedekiah's injuries but testified that the injuries could have been caused by an impact with a blunt object or something striking his head or his head striking something.

While executing a search warrant, deputies recovered three 7.62 cartridge casings in the foyer area of the home, a purple SCCY nine-millimeter pistol in the downstairs bedroom, a Smith and Wesson nine-millimeter pistol in a standalone toolbox in the garage, and a SKS rifle in the garage buried under several items. Deputies also discovered three bullet holes in the foyer area of the home and two bullets, one located underneath the stairs of the front porch and the other on the support beam underneath the foyer. A forensic expert testified that she could not definitively say whether the bullets and cartridge casings found at the scene came from the SKS rifle located there, nor could she confirm if they originated from the same firearm. But she confirmed that the SKS rifle found at the scene is the type of firearm that would fire these bullets and cartridge casings.

11

A sample of Appellant's blood from January 24, 2020, was checked for "drugs or poisons." The results of that test showed negative results for several drugs, including marijuana, cocaine, common opioids, and certain prescription and over-the-counter medications.

2.    In his first enumeration of error, Appellant contends that he was not given warnings required by *Miranda* prior to making statements at the sheriff's office,[9] and that the trial court erred by denying his motion to suppress the three guns found in the house because the guns were discovered only as a result of the information he provided in his statement given without *Miranda* warnings. We disagree.

The facts relevant to this enumeration are as follows. At a *Jackson-Denno*[10] hearing outside the presence of the jury prior to trial, investigators testified that deputies initially placed Appellant

---

[9] Appellant also contends as part of his first enumeration of error that the trial court erred by not excluding the statement made at the sheriff's office, but that statement was not admitted into evidence, nor did anyone testify about what Appellant said at trial.

[10] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LEd2d 908) (1964).

in the back of a patrol car because it was cold outside, and the house and surrounding area was an active crime scene.

After interviewing McKeda, investigators returned to the crime scene at 7:55 a.m. and asked Appellant, who was still in the back of the patrol car, if he would like to come to the sheriff's office to talk. When asked if Appellant seemed "willing and eager" to speak, investigators testified that Appellant was. During the ride, Appellant was unrestrained and rode in the front seat. Appellant was "chatty" on the ride to the station, discussing his life and growing up in Atlanta.

Once they arrived at the sheriff's office, investigators took Appellant to an interview room at 8:16 a.m. for a recorded conversation about what happened. Appellant seemed "very willing" to talk, "offer[ing] information" without being asked, including informing investigators that Appellant was a convicted felon. Investigators asked Appellant whether there were any firearms at his home, citing safety reasons for the deputies who were clearing the home, and not knowing whether Sims—whom deputies had not

13

yet identified or located—was still in the home. Appellant responded that there were firearms in the home and told investigators where they were located. At this point, investigators determined that Appellant was not free to leave because Appellant was suspected of being involved in shooting Zedekiah, was a convicted felon, and had firearms in the home. Appellant was interviewed for approximately six hours and remained in the interview room until 5:00 or 6:00 p.m., at which point he was placed under arrest. At no point before, during, or after the conversation with investigators was Appellant informed of his *Miranda* rights.

Before trial, the State and trial counsel for Appellant entered into an agreement, stipulating that Appellant was not given *Miranda* warnings at any time before he was questioned at the sheriff's office. However, they also agreed that his statement to investigators, regarding being a convicted felon and having firearms in his home, was voluntary. Given the lack of warnings required by *Miranda*, the parties agreed that the statement would not come into evidence unless Appellant testified, at which point it could be used

14

for impeachment. The following occurred regarding the stipulation:

> DEFENSE COUNSEL: So I had to spend some time talking to my client about that issue and then the issue of being able to be impeached if he were to testify with that statement, if it's deemed to have been voluntary. And I had a discussion with him further this morning about the voluntariness of that statement. And when I say -- when I talk about the statement, it's the one that he made at the sheriff's office. And I believe he agrees, based upon the definition of voluntariness, that he wasn't coerced. He wasn't threatened. He wasn't promised anything when he made that statement to the sheriff's office. But I believe he understands that that statement is voluntary and could possibly come into impeachment if he were to testify, so. And I just wanted -- because it came up really quickly, I just want to make sure, on the record, that my client understood the issue for clarification. . . . I think we can stipulate that it was voluntary with the understanding that he wasn't coerced, threatened, or promised anything to make the statement. He just wasn't Mirandized. . . .
> TRIAL COURT: Well, it sounds like to me [Defendant is] stipulating that it's a voluntary statement.
> STATE COUNSEL: Okay.
> TRIAL COURT: But it doesn't come in under – in any way, shape, or for unless defendant testifies.
> STATE COUNSEL: Understood.

Before jury selection continued the following morning, trial counsel told the trial court that they needed to have a *Jackson-Denno* hearing because she wanted to raise a "fruit of the poisonous

15

tree argument," asserting that the guns would not have been found had it not been for the statement made without warnings required by *Miranda*. During the *Jackson-Denno* hearing later that day, an investigator testified about the interview. Trial counsel argued that the guns found in the home should have been suppressed because Appellant was not Mirandized and because the investigator deceived Appellant regarding the need to know where the guns were for officer safety. The trial court rejected this argument, citing *United States v. Patane*, 542 U.S. 630, 643 (124 SCt 2620, 159 LE2d 667) (2004), which holds that physical evidence obtained from a statement given without *Miranda* warnings is admissible if it is voluntary. In this instance, the trial court concluded that "[a]ll of the evidence shows the statements were voluntary." In making its ruling, the trial court recited the testimony presented and did not rely on the stipulation set forth the previous day.[11]

---

[11] The trial court first stated that it was assuming that *Miranda* was required to be given, but that *Patane* did not require suppression of physical evidence obtained by unwarned, voluntary statements. However, it later concluded that Appellant was not in custody and *Miranda* was not required.

16

On appeal, Appellant argues that the failure to Mirandize him while he was in custody required that the firearms discovered because of that statement given without *Miranda* warnings should have been excluded as "fruit of the poisonous tree." Appellant also contends that he was extremely intoxicated and in shock when he made the incriminating statement; therefore, continued questioning rendered the statement involuntary. For the reasons we explain below, this claim fails.

Warnings under *Miranda* must be given when an individual is in custody and subject to interrogation, or its functional equivalent. See *Johnson v. State*, 301 Ga. 707, 711 (804 SE2d 38) (2017). A person is considered in custody, for *Miranda* purposes, when he is "(1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings

---

Because we determine below that the trial court did not abuse its discretion in finding that Appellant voluntarily gave his statement, we need not resolve the issue of whether Appellant was in custody for *Miranda* purposes.

17

are not necessary." *Acosta v. State*, 311 Ga. 320, 325 (857 SE2d 701) (2021) (cleaned up). Other than a few exceptions, a statement obtained in violation of *Miranda* is inadmissible. See *Gonzalez v. State*, 319 Ga. 787, 789 (906 SE2d 705) (2024). However, physical evidence obtained because of a statement obtained in violation of *Miranda* is not necessarily inadmissible. Rather, if the statement given without *Miranda* warnings is made voluntarily, while in custody, the physical evidence discovered because of the unwarned statement may be admissible. See *Patane*, 542 U.S. at 642-644 (concluding that the failure to provide *Miranda* warnings did not require suppression of the physical evidence of the suspect's voluntary statement given without *Miranda* warnings while in custody). See also *Jenkins v. State*, 317 Ga. 585, 591 n.6 (894 SE2d 566) (2023) (discussing *Patane*).

Reviewing the grant or denial of a motion to suppress requires this Court to "construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment." *Westbrook v. State*, 308 Ga. 92, 96 (839 SE2d 620) (2020) (cleaned

18

up). The trial court's factual and credibility findings must be accepted unless they are clearly erroneous. See *Hughes v. State*, 296 Ga. 744, 746 (770 SE2d 636) (2015). Here, the trial court found that the investigators' interactions with Appellant were "conversational"; that investigators never got loud with Appellant, never threatened him, never coerced him, nor promised him anything; and that Appellant voluntarily went to the sheriff's office to be interviewed about what happened on the night of the shooting.

In light of those findings, we cannot say the trial court abused its discretion when it concluded that, based on the totality of the circumstances, Appellant's statement to investigators was voluntary. Indeed, the record supports the trial court's finding that Appellant was not subjected to any "coercive police interrogation[]" that would have rendered his statement involuntary. See *Patane*, 542 U.S. at 640 (cleaned up). And although Appellant contends that he was "also extremely intoxicated and in shock," he does not point to any evidence that shows that his intoxication rendered his statement constitutionally involuntary. See *State v. Franklin*, 318

19

Ga. 39, 43 (897 SE2d 432) (2024) ("Thus, even if a defendant gives a statement while significantly intoxicated or influenced by drugs, the statement is not involuntary as a matter of constitutional due process absent some evidence of coercive conduct by law enforcement in eliciting the statement.").

Therefore, because the record supports the trial court's findings that Appellant voluntarily gave the statement about the firearms and that Appellant was not subject to any coercive conduct by law enforcement, the trial court was not required to suppress the evidence. See *Patane*, 542 U.S. at 642-644. See also *Clay v. State*, 290 Ga. 822, 828 (725 SE2d 260) (2012) (noting that "*Patane* held that the suppression of the physical fruits of a defendant's unwarned but voluntary statements is not constitutionally required . . ."). Accordingly, this claim fails.

3.    Appellant next contends that he was denied the effective assistance of counsel with respect to his trial counsel's handling of the stipulation and one of the State's expert witnesses. To prevail on a claim of ineffective assistance of counsel, an Appellant must prove

both that the attorney's performance was professionally deficient and that the deficiency resulted in prejudice to his case. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, the defendant must show that his attorney's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. See id. at 687-690. To establish the required prejudice, the defendant must show that but for his attorney's unprofessional errors, there is a "reasonable probability" that the result of the proceeding would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "This burden, though not impossible to carry, is a heavy one." *Ellis v. State*, 292 Ga. 276, 283 (736 SE2d 412) (2013). See *Kimmelman v. Morrison*, 477 U.S. 365, 381-382 (106 SCt 2574, 91 LE2d 305) (1986). Appellant has not carried his burden here.

(a) Appellant asserts that his counsel was deficient because she failed to prepare for and properly handle the *Jackson-Denno*

21

hearing. Particularly, Appellant contends that trial counsel was deficient because she stipulated to the voluntariness of Appellant's statement to investigators, knowing he had not been informed of his *Miranda* rights. Appellant contends, without offering further explanation, that the stipulation led to the admission of the three firearms found in Appellant's home and inhibited his ability to testify for fear that his interview with investigators would be used against him.

Pretermitting whether counsel was deficient for agreeing to the stipulation, Appellant cannot show prejudice because the record is clear that the trial court did not rely on the stipulation in ruling that the firearms were admissible in light of Appellant's unwarned, but voluntary statement. Specifically, the trial court determined on its own, apart from the stipulation, that "[t]here is zero coercion exercised by the detective towards [Appellant] . . . ." Cf. *Scott v. State*, 317 Ga. 799, 808 (896 SE2d 484) (2023) (determining that even if trial counsel's failure to object to evidence and testimony that potentially raised an inference that Appellant was a member of a

gang was deficient, such testimony was of limited value because of other evidence, including Appellant's own testimony, that he knew gang members). See also *Turner v. State*, 308 Ga. 537, 540-541 (842 SE2d 40) (2020) (concluding that even assuming trial counsel was deficient, the defendant could not show prejudice because the disputed testimony held minimal value to the State's case). Likewise, we uphold the trial court's ruling without relying on the stipulation. Therefore, Appellant has failed to show any prejudice stemming from trial counsel's alleged deficient performance in making the stipulation and his ineffective assistance of counsel claim fails.

(b) Appellant also asserts that his trial counsel failed to object to the State's media specialist witness, T.J. Jaglinski, on the correct basis. Jaglinski testified that he enhanced Rose's 911 call so that it could be heard more clearly. He took portions of the 911 call and removed background noise, boosted the audio, and used equalizers to remove extraneous noises. Following Jaglinski's testimony, each juror was given a copy of the transcript of the 911

23

call and the audio was played for the jury during an investigator's testimony. The investigator testified that he "believed" that Appellant could be heard on the call saying, "I'm going to jail for murder." At trial, Appellant's counsel objected to the admission of the enhanced 911 recording based on the continuing witness rule.[12] Appellant contends, without citation to any authority beyond *Strickland*, that trial counsel should have objected to the State's failure to adequately establish that Jaglinski was an expert regarding his testimony on the process of enhancing Rose's 911 call, rather than on the basis of the continuing witness rule.[13] Appellant argues that the State provided no proof that Jaglinski had the appropriate level of education, training, or experience to alter base levels and remove sections of background audio and that, as a result, the enhanced 911 recording should not have been admitted.

---

[12] The "continuing witness" rule is founded on the idea that written testimony is perceived by the jury in the same way as oral testimony when delivered from the witness stand. Allowing written testimony to accompany the jury for review during deliberations creates an unfair advantage, placing undue emphasis on it, while oral testimony is considered only once. See *Keller v. State*, 308 Ga. 492, 505-506 (842 SE2d 22) (2020).

[13] Some of us question whether this error was properly raised as an issue of expert qualifications. Nevertheless, we address the issue as it was presented.

Additionally, Appellant contends that OCGA § 24-7-702, which extends the *Daubert*[14] standard to criminal trials, should have been applied to Jaglinski's testimony, and thus appears to argue that trial counsel was deficient in not making an objection under *Daubert*.

As an initial matter, counsel could not have been deficient in failing to raise a *Daubert* objection, given that OCGA § 24-7-702 only applies to criminal trials commenced on or after the statute's July 1, 2022, effective date. See Ga. L. 2022, p. 201, § 2.[15] Appellant's trial occurred in February 2022, making the statute inapplicable. See *Scott v. State*, 306 Ga. 417, 420 (831 SE2d 813) (2019) (concluding that trial counsel is not ineffective for failing to apply law that was not applicable at the time of trial).

Moreover, other than the investigator's testimony that he "believed" that Appellant was the speaker in the background of

---

[14] *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993).

[15] At the time of Appellant's trial, *Harper v. State*, 249 Ga. 519 (292 SE2d 389) (1982), was the relevant case under which a party would object to an expert's qualifications under Rule 702. But Appellant does not contend that his counsel was ineffective for failing to object based on *Harper*, and so we do not address it here.

Rose's 911 call, it is not readily apparent who is speaking. And even with Jaglinski's enhancements, the 911 call still contains a noticeable amount of background noise that makes it difficult to clearly hear what is being said in the background, much less to conclude that Appellant is saying anything inculpatory on the call.

Additionally, prior to the playing of the 911 call at trial, the trial court instructed the jury that

> The contents of the tape are the evidence, not the transcript that the district attorney's office has prepared that is going to be handed to you. . . . And if you think the audiotape says something different, then the audiotape and your discernment of what it says is the evidence and not the purported transcript. The transcript is someone else's opinion of what's depicted on the audiotape . . . .

In her closing argument, Appellant's trial counsel further encouraged the jury to determine for themselves what was said on the call, contending that "the State wants you to hear what they hear." Therefore, the enhanced 911 call itself did not have a significant inculpatory effect, and we cannot say that but for trial counsel's failure to raise an objection that may have required the

26

exclusion of the enhanced 911 call, there is a reasonable probability that the outcome of the trial would have been different.

The other evidence against Appellant was very strong. Here, there is eyewitness testimony from McKeda that Appellant shot Zedekiah with a rifle. There was also significant evidence undermining Appellant's claim that someone in a black Dodge Charger fought with and shot Zedekiah. Specifically, McKeda and Sims testified that the couples fought prior to the shooting and that the only people in Appellant's home were the five adults; that there was evidence of a struggle in the upstairs master bedroom; and that ballistics evidence indicated that the shooter was likely standing inside the home and shooting toward the direction of the front door. Thus, Appellant cannot show a reasonable likelihood that the result of his trial would have been different had trial counsel objected to the State's failure to qualify Jaglinski as an expert, as opposed to based on the continuing witness rule. Accordingly, this claim fails. See *Isaac v. State*, 319 Ga. 25, 32 (901 SE2d 535) (2024) ("Given the strong evidence of Isaac's guilt and the cumulative nature of his

potential trial testimony, there is not a 'reasonable probability' that had Isaac testified along the lines that he testified at the motion for new trial hearing, 'the result of the proceeding would have been different.'"); *Mitchell v. State*, 308 Ga. 1, 7 (838 SE2d 820) (2020) (concluding no prejudice from counsel failing to introduce evidence, in part because evidence of defendant's guilt was overwhelming).

4. Appellant next asserts that the trial court abused its discretion by admitting Sims's prior inconsistent statement because the State did not first afford Sims the opportunity to explain or deny the substance of the statement pursuant to OCGA § 24-6-613 (b).[16] The statement was a video-recorded interview Sims had with investigators the day after the crime, a portion of which was played for the jury.

---

[16] OCGA § 24-6-613 (b) provides, in relevant part, that:

> [E]xtrinsic evidence of a prior inconsistent statement by a witness shall not be admissible unless the witness is first afforded an opportunity to explain or deny the prior inconsistent statement and the opposite party is afforded an opportunity to interrogate the witness on the prior inconsistent statement or the interests of justice otherwise require.

28

At trial, Sims was questioned by the State about statements he made regarding his version of events the night of the shooting. Several times during his testimony, Sims responded that he did not recall making specific statements to investigators because he was under the influence of drugs during the interview. As a result, Sims's interview was admitted as a prior inconsistent statement through the testimony of an investigator, over Appellant's objection.

Appellant contends that the State failed to lay the appropriate foundation for admitting Sims's interview because it did not inquire further into the conversation between Sims and investigators during Sims's testimony, nor was Sims afforded an opportunity at trial to explain or deny any prior inconsistencies. Appellant also argues that the trial court's reliance on *Murdock v. State*, 299 Ga. 177, 179-180 (787 SE2d 184) (2016), for admitting Sims's interview was misplaced because, unlike in *Murdock*, Sims was only briefly questioned about his interview with law enforcement.

We review a trial court's evidentiary ruling for an abuse of discretion. See *Bridgewater v. State*, 309 Ga. 882, 886 (848 SE2d

29

865) (2020). "A witness's failure to remember making a statement may provide the foundation for offering extrinsic evidence to prove that the statement was made." *London v. State*, 308 Ga. 63, 67 (838 SE2d 768) (2020) (cleaned up). Here, the State established the foundation for offering Sims's recorded interview with investigators by asking Sims several times if he remembered making the statements, to which he replied that he did not. And contrary to Appellant's contention, Sims's failure to recall his interview relieved the State from having to ask about specific statements Sims made during the interview. See *Bridgewater*, 309 Ga. at 887 (holding that a witness's "unambiguous denial that he had ever spoken with [another witness] — as well as his assertion that he did not recall ever speaking with [the second witness] — obviated the need for the prosecutor to ask [the first witness] about specific statements he made to [the second witness] and provided sufficient foundation for the State to present extrinsic evidence of such statements").

Moreover, Appellant's understanding of *Murdock* is inaccurate. In *Murdock*, the witness could not recall her interview with an

30

investigator, so the court allowed testimony regarding the interview to be introduced through the investigator. Here, like in *Murdock*, Sims's failure to recall the details of his interview with investigators provided the foundation "for calling another witness to prove the statement was made." *Murdock*, 299 Ga. at 180 (cleaned up). Therefore, because there was sufficient foundation laid under OCGA § 24-6-613 (b), the trial court did not abuse its discretion by admitting Sims's recorded interview as a prior inconsistent statement. See *Green v. State*, 317 Ga. 250, 254-255 (892 SE2d 733) (2023).

5. Appellant further argues that the trial court erred by denying his motion to bifurcate the malice murder (Count 1) and aggravated assault (Count 2) charges from the felon-in-possession counts (Counts 4, 6, and 7). Count 4 served as the predicate for one of Appellant's felony murder counts (Count 5).[17] Appellant asserts that the felon-in-possession counts were not necessary predicates to

---

[17] Appellant was also charged with an additional felony murder count (Count 3), which was predicated on Count 2.

the malice murder charge and should have been bifurcated to allow the jury to deliberate on the facts in question without considering Appellant's prior convictions. And, by trying the counts together, the State was allowed to bring in Appellant's prior conviction, which otherwise would not have been introduced because Appellant did not testify.

"This Court has held that, in cases where a felon-in-possession firearm charge is unrelated to another count for which the defendant is to be tried, the proceedings should be bifurcated so that the jury will hear and decide the more serious charge(s) before learning about the firearm charge and the defendant's prior conviction." *Brown v. State*, 295 Ga. 804, 807 (764 SE2d 376) (2014) (cleaned up). However, when the felon-in-possession count serves as the predicate offense for felony murder, "the trial court should deny the motion to bifurcate . . . ." See *Charles v. State*, 315 Ga. 651, 659 (884 SE2d 363) (2023). Here, because Count 4 (felon-in-possession) was the predicate for Count 5 (felony murder), the trial court did not err when it denied Appellant's motion to bifurcate as to Count 4.

Regarding Counts 6 and 7, pretermitting whether the trial court erred in denying Appellant's motion to bifurcate, we conclude any such error was harmless.

> The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. And in considering whether a trial court's error was harmful, we weigh the evidence as we would expect reasonable jurors to have done so, as opposed to assuming that they took the most pro-guilt possible view of every bit of evidence in the case.

*Lofton v. State*, 309 Ga. 349, 356-357 (846 SE2d 57) (2020) (cleaned up).

Appellant argues that the trial court's denial of the motion to bifurcate allowed the State to present evidence of his prior conviction to the jury, which would not have been admissible because he did not testify. However, Appellant overlooks the fact that the jury would have been made aware of his prior conviction because of Count 4, the predicate offense for Count 5. Thus, regardless of whether Appellant chose to testify, the jury would have known he was a convicted felon because of the felon-in-possession charge in Count 4. Consequently, any error in the trial court's denial

of the motion to bifurcate was harmless. See *Walker v. State*, 360 Ga. App. 211, 216 (860 SE2d 868) (2021).

6. Appellant contends that the trial court erred by refusing to give jury instructions on voluntary manslaughter and mutual combat. Appellant argues that the combination of witnessing his wife being assaulted by McKeda, evidence indicating that Rose informed 911 operators that Appellant was "fighting for his life" and the severity of the events leading up to the shooting—so intense that Sims felt compelled to leave—constituted sufficient provocation to justify a charge of voluntary manslaughter.

"A trial court is required to grant the defendant's request for a charge on the lesser included offense of voluntary manslaughter if there is any evidence, however slight, to support such a charge." *Jones v. State*, 319 Ga. 140, 146 (902 SE2d 599) (2024) (cleaned up). Determining if there is slight evidence to support the charge is a question of law. See *Wilkerson v. State*, 317 Ga. 242, 247 (892 SE2d 737) (2023). To justify an instruction for voluntary manslaughter, Appellant must show that the killing occurred "solely as the result

34

of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person . . . ." OCGA § 16-5-2 (a). Based on the record, Appellant cannot make that showing.

Although Appellant contends that the evidence demonstrates his fear for both his own life and his wife's, there is no indication that Appellant was angry or inflamed by Zedekiah's actions immediately before the shooting. "And there was no other evidence that the shooting was the result of a sudden, violent, and irresistible passion." *Rayton v. State*, 314 Ga. 29, 34 (875 SE2d 708) (2022). Appellant does not "point to even slight evidence that he reacted passionately to [Zedekiah's] conduct rather than simply in an attempt to defend himself." Id. See also *Collins v. State*, 312 Ga. 727, 740 (864 SE2d 85) (2021) (concluding that a voluntary manslaughter instruction was not warranted, emphasizing that while the victim directed abusive language toward the defendant, there was no evidence to suggest that the defendant was "angry or mad or that he had any other response showing he might have reacted

35

passionately—only that he was scared and was defending himself . . .”); *Beck v. State*, 310 Ga. 491, 497 (852 SE2d 535) (2020) (concluding there was insufficient evidence to justify a jury instruction on voluntary manslaughter, despite the defendant’s testimony that he was “just scared” and acting in self-defense to protect himself, his girlfriend, and her family when he shot the victim); *Tarpley v. State*, 298 Ga. 442, 445 (782 SE2d 642) (2016) (“Tarpley’s statements to police and trial testimony do not indicate that he killed Estes out of some irresistible passion—whatever the source of that passion—but, instead, that the killing occurred because Tarpley was ‘very afraid’ of Estes that night; further, there is no other evidence indicating that the shooting here arose out of passion rather than fear.”). Therefore, the trial court did not err when it failed to give a jury instruction on voluntary manslaughter.

Regarding Appellant’s claim that the jury should have been instructed on mutual combat, Appellant failed to support this contention with any argument, citation of authority, or citation to the record. Thus, it is abandoned under Supreme Court Rule 22. See

Ga. Sup. Ct. R. 22.

7.     Finally, Appellant summarily contends that "[c]ourts have the right to examine the totality of circumstances and to void convictions which are unjust. The interests of justice in [Appellant's] case demand it," and Appellant "should be granted a new trial." Appellant does not cite *State v. Lane*, 308 Ga. 10, 17 (838 SE2d 808) (2020), or provide any additional argument, but we will assume that the above contention stands for the proposition that the combined prejudicial effect of the trial court's errors and trial counsel's deficiencies affected the outcome of his trial.

"To establish cumulative error a defendant must demonstrate that at least two errors were committed in the course of the trial and considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the [defendant] a fundamentally fair trial." *Huff v. State*, 315 Ga. 558, 567-568 (883 SE2d 773) (2023) (cleaned up). "When considering the cumulative effect of presumed errors by trial counsel and the trial court, this Court consider[s] collectively the prejudicial effect, if any,

of trial court errors, along with the prejudice caused by any deficient performance of counsel." Id. at 568 (cleaned up).

For the purposes of this analysis, we have assumed the deficient performance of counsel in Divisions 3 (a) (agreeing to stipulate to voluntariness) and 3 (b) (objecting to the State's witness on the incorrect basis) and the trial court's error by failing to bifurcate Counts 6 and 7 (felon-in-possession) from Count 1 (malice murder) and Count 2 (aggravated assault) in Division 5. As we noted above, the errors in question are not prejudicial or harmful separately, and we conclude that they are not the kinds of errors that would cause cumulative error even if considered together. Particularly, the stipulation did not affect what evidence was presented at trial because the trial court determined that Appellant's statement was voluntary without relying on the stipulation. Regarding the enhanced 911 call, the jury was instructed to rely on its own interpretation of the audio, and its weight was limited by the remaining background noise and the lack of clear indication of who was speaking in the background and what

38

was being said. Finally, the failure to not bifurcate was harmless because the jury was going to hear about Appellant's prior conviction because of the felon-in-possession count that served as the predicate for one of Appellant's felony murder charges.

There was also compelling evidence supporting Appellant's guilt for the charged crimes. This includes eyewitness testimony from McKeda and significant evidence undermining Appellant's claim that someone else shot Zedekiah. See *Lofton*, 309 Ga. at 367 (concluding that the "cumulative prejudicial effect of the actual and assumed evidentiary errors and counsel's deficiencies is not sufficient to outweigh the strength of the properly admitted evidence of [the defendant's] guilt . . ."). Therefore, even if considered together, the result of these assumed errors did not deny Appellant a "fundamentally fair trial," so the standard for cumulative error is not met. See *Lane*, 308 Ga. at 21.

*Judgment affirmed. All the Justices concur.*